**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Ryan Quarles,** | : | |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| **Commissioner Danielle Outlaw, in** | : | **Civil Action** |
| **her official capacity, et al.** | : | **No. 21-cv-02813** |
| | : | |
| | : | |

**PLAINTIFF'S CONCISE STATEMENT**
**OF ADDITIONAL FACTS.**

**Preliminary Facts.**

1.     Mr. Quarles is, and has been since at least 2015, a resident of Georgia. Mr. Quarles' regularly travels back and forth from Georgia to Philadelphia, Pennsylvania, to visit family. **Exhibit A**, **Mr. Quarles' Dep., 12**, **14:22-24.**

2.     Since April 14, 2018, Pennsylvania and Georgia have been parties to a Reciprocity Agreement in which each state agrees to honor the other's licenses to carry firearms (LTCs or gun permits) that are issued to its respective residents who are at least 21-years old. **Exhibit B**, **Pennsylvania-Georgia Reciprocity Agreement** ("Reciprocity Agreement").

3.     From September 29, 2016, to July 28, 2020, Mr. Quarles possessed a valid license to carry a firearm (LTC) issued from the Probate Court in Gwinnett County, Georgia. **Exhibit C**, **Judge Ballar's Letter.**

4.     The State of Georgia denies all law enforcement agencies access to gun permit records. If law enforcement needs to verify a gun permit issued out of Georgia, it must contact the specific probate court from where the permit was issued. O.C.G.A. §§ 16-11-129(1), 50-18-72(a)40. Georgia's probate courts are the only entities that can verify gun permits. **Exhibit C.**

5.     Commissioner Outlaw is aware of the Reciprocity Agreement and should be aware that Georgia gun permit holders will travel to Philadelphia and lawfully carry their firearms. **Exhibit D, Commissioner Outlaw's Answer to Request for Admission, 3.**

6.     Unlike Georgia, in Pennsylvania, law enforcement must verify LTC via law enforcement databases, not the court. Thus, Commissioner Outlaw trains PPD officers on the proper procedure to verify Pennsylvania gun permits. However, she does not provide any training or guidance to PPD's officers on how to verify gun permits from the State of Georgia, despite the existence of the Reciprocity Agreement.  **Exhibit D, 3; Exhibit E, PPD Directive 5.27.**

7.     Consequently, when PPD officers encounter Georgia residents who carry firearms under the authority of a Georgia LTC, the officers do not know how to properly verify the Georgia permits. Thus, the officers attempt to verify Georgia LTCs the same way that they verify Pennsylvania LTCs which will result in an unlawful arrest. **Exhibit F, Officer Ponente Dep., 6-7, 31-32; Exhibit G, Officer**

**Tilghman Dep., 6-7, 14-15; Exhibit H, Det. Jara Dep., 6-7.**

8.     At all relevant times in 2020, Mr. Quarles' Georgia LTC authorized him to carry firearms on the public streets of Pennsylvania pursuant to the Pennsylvania-Georgia Agreement because he was at least 21-years old.  **Exhibit C.**

9.     Pursuant to Georgia law, the criminal charges to which Defendants refer in their Statement of Facts, (EFC Doc. No. 46-2, ¶¶ 35-38),[1] were in an inoperative status thus not even legally pending, which is why, ***according to the State of Georgia, as explained by Judge Ballar***, Mr. Quarles was in fact legally authorized to possess and carry a firearm at all relevant times in 2020. **Exhibit C.**

**Mr. Quarles' February 3, 2020, Encounter with Defendants Ponente and Rozman.**

10.     While stopped at the intersection of Gray Street and Chew Avenue, Officers Ponente and Rozman saw Mr. Quarles pull him over without having a legal basis to justify the stop. Mr. Quarles immediately complied with the Officers' signal to pull over. **Exhibit A, 26-28.**

11.     Upon searching Mr. Quarles' person, Officer Ponente found Mr.

---

[1] The Court should be mindful that the documents which Defendants cite appear *inaccurate and unreleiable*, not even certified, and, without a Georgia custodian, contain inadmissible hearsay. Moreover, Defendants have not disclosed, as required by Fed. R. Civ. P. R. 26, to Mr. Quarles any custodian with discoverable information who would be authorized to authenticate said documents. In any event, Mr. Quarles had a valid Georgia gun permit at the time of both of his arrests in this case as there is no question that his LTC was validly issued by Georgia.

Quarles' .38 Special snub-nose revolver inside of his front pocket. Officer Ponente also recovered Mr. Quarles' Georgia LTC from his pocket and arrested him unlawful gun possession without even first determining whether the LTC was valid. **Exhibit A, 30; Exhibit F, 12:6—13; Exhibit I, 00:27—01:47, 02:30-02:36.**

12. *After* he arrested Mr. Quarles for carrying a firearm without an LTC, Officer Ponente *then* attempted to verify the Georgia LTC pursuant to the training that Commissioner Outlaw provided him. When he was informed that Pennsylvania authorities could not verify a Georgia LTC the same way as a Pennsylvania LTC, he called the State of Georgia's Bureau of Investigation (GBI) Fusion Center to check the validity of the LTC. **Exhibit F, 6-7; Exhibit I, 05:20—08:38, 18:25—18:33.**

13. An agent from GBI informed Officer Ponente that Georgia does not have a statewide database to access to gun permit records. The GBI agent further informed Officer Ponente that he had no way to verify an LTC and that he needed to contact the local courthouse for their records. The GBI agent directed Officer Ponente to Gwinnett County Police Department (GCPD) to speak with its CID division in hopes that it could connect him to a resource that could verify the gun permit. **Exhibit I, 18:33-20:43.**

14. When Officer Ponente called GCPD, he never spoke with an officer

from the CID, as the GBI agent instructed, because a 911 emergency hotline operator informed him that the CID office was closed. The operator advised him that she could give him the CID phone number for future references. **Exhibit I, 21:20-21:56.**

15.     It is understood among law enforcement officials, including Officer Ponente and the GBI officer who directed him to GCPD's CID, that 911 emergency hotline operators are not trained to verify gun permits. **Exhibit I, 20:20—20:29; Exhibit F, 8:15—10:3. Exhibit G, 9-10; Exhibit H, 6:8—7:3.**

16.     When Officer Ponente called GCPD, the 911 dispatch operator told him at least three times that Georgia law enforcement does not have access to gun permit information. Moreover, the dispatch officer even informed Officer Ponente that if Georgia law enforcement ran someone's gun permit through the state's **CID**/NCIC database, no gun permit status will show up. **Exhibit I, 20:43—24:26.**

17.     The 911 emergency hotline operator then informed Officer Ponente that he could send a "teletype" and that someone will try to assist him when available. When Officer Ponente asked, "how long would that take," the dispatch officer explained, again, that her office does not have access to gun permit records. **Id.**

18.     Approximately five minutes after Officer Ponente had the teletype sent to Georgia, a response came back that it had **"no information"** on Mr. Quarles'

gun permit. However, this information is consistent with what GBI and GCPD 911 operator told the Officer about Georgia law enforcement not having access to gun permit records. **Exhibit I**, **33:40—33:54**, **18:33-20:43, 20:43—24:26.**

19.     Moreover, Officer Ponente acknowledges that he knew that the teletype was being sent to the same GBI Fusion Center that had previously informed him that it had no access to gun permit records based on what he wrote his police report and the false "teletype" procedure that he explained to his front desk supervisor. **Exhibit J; Exhibit I, 26:18—31:20.**

20.     Despite his claims to the contrary, Officer Ponente believed Mr. Quarles' LTC to be "legitimate." **Exhibit F, 12:2-4.**

21.     Officer Ponente telephoned PPD Detective Shane Rose and falsely implied that the GBI Fusion Center instructed him to "go through police radio room" to send a teletype to verify Mr. Quarles' gun permit. **Exhibit I, 35:50-36:09.**

22.      Officer Ponente then falsely stated that Georgia "denied" that Plaintiff had a valid gun permit. In explaining the situation to Detective Rose, Officer Ponente never told Detective Rose that:

   a)  GBI's Fusion Center informed him that it does not have access to gun permit records;

   b)  GBI's Fusion Center informed him that he had to check the local courthouse records for gun permit information;

c) GBI's Fusion Center directed him to contact GCPD's CID division for assistance, but he never called the CID;

d) Instead of contacting GCPD's CID for assistance, he attempted to verify Mr. Quarles' gun permit through an untrained 911 emergency hotline operator who explained that she does not have gun permit records.

e) The GCPD 911 operator warned him that a Georgia law enforcement CID/NCIC search will produce "**no information**" on gun permits;

f) The Georgia teletype with "no information" was consistent with what both the GBI and 911 operator informed him about law enforcement not having access to gun permit records.

g) Georgia never "Denied" that Mr. Quarles had an LTC.

**Exhibit I, 35:50—36:39.**

23.     Officer Ponente's police report confirms his intention and plan to have Mr. Quarles wrongfully prosecuted based upon false statements. In his report, Officer Ponente falsely states that the GBI Fusion Center "denied" that Mr. Quarles had an LTC, even though the GBI agent specifically informed him that law enforcement has no way to verify a gun permit. Compare **Exhibit J** with **Exhibit I, 18:33-20:43.**

24.     Because Commissioner Outlaw does not train PPD officers how to verify Georgia gun permits through the probate court, Detective Rose was unaware of Georgia's unique gun laws and relied on Defendant Ponente's false statements. **Exhibit I, 35:50—36:39.**

25.     Because Commissioner Outlaw does not train PPD officers on how to verify a Georgia gun permit through the probate court, other PPD officers on the scene of Mr. Quarles' arrest, including a supervising officer, Sergeant Kotoka Shipanga, had no knowledge of how to verify Mr. Quarles' Georgia gun permit. Sergeant Shipanga was so perplexed that he even asked Defendant Ponente if he had ever encountered "this situation before?" **Exhibit I, 25:00-25:43.**

26.     Having not been trained how to verify a Georgia LTC, Sergeant Shipanga relied entirely on Officer Ponente's deceptive narrative about having "our front desk send a teletype to Georgia's police front desk" to obtain Georgia gun permit information. **Exhibit I, 25:00-25:43.**

27.     Officer Ponente never provided Sergeant Shipanga with a full account of what he was told by Georgia officials. Instead, Officer Ponente omitted all the important information he was provided and mentioned only the teletype without providing proper context. **Exhibit I, 25:00-25:43; 34:45—35:32.**

28.     If Commissioner Outlaw would have provided training or guidance to Officer Ponente in verify Georgia gun permits according to Georgia law, he would have used the correct procedure to verify Mr. Quarles' gun permit. **Exhibit F, 3017—31:15.**

29.     Officer Ponente admitted that sometime in either 2017 or 2018, he encountered a Georgia gun permit holder and attempted to verify the Georgia

permit using the wrong procedure used in this case. **Exhibit F, 10:18—11:15:**
**Exhibit C.**

30.     When Officer Ponente called PPD's "front desk" seeking assistance from a supervisor in sending the teletype to Georgia law enforcement, he falsely stated that he was instructed to send the teletype by the GBI Fusion Center. Because Commissioner Outlaw does not train PPD's officers how to properly verify Georgia LTCs, no one detected Officer Ponente's false statements. **Exhibit I, 26:18—31:20.**

### Mr. Quarles' March 2020 Encounter with PPD.

31.      In March 2020, Mr. Quarles' Georgia LTC was still active. **Exhibit B.**

32.     On March 28, 2020, PPD Officers Kevin Tilghman and Aaron Turner found Mr. Quarles in possession of a firearm in public. The officers arrested Mr. Quarles for carrying a firearm without a license because they did not know how to properly verify a Georgia LTC through the probate court. **Exhibit G, 6-7, 15-17:10.**

33.     Detective Gregory Jara attempted to verify whether Mr. Quarles had a valid LTC from Georgia but could not because Commissioner Outlaw does not train or provide any guidance on how to properly check the validity of a Georgia LTC. **Exhibit H, 6—8:3.**

34.     After Mr. Quarles was already arrested and brought to the police station

to be charged for carrying a firearm without a license, Detective Jara—not Officer Tilghman at the scene—investigated the firearm that Mr. Quarles possessed and learned that it was reported stolen. **Exhibit H, 8:4-16.**

35.     PPD was not able to uncover any evidence that Mr. Quarles knew the firearm was reported stolen or that he otherwise received stolen property.  **Exhibit H, 9-10; Exhibit G, 17:24—20:4.3**

### Foreseeability of Harm and Obvious <u>Need for Training</u>.

36.     There is no dispute that verifying gun permits is one of the most important responsibilities of a PPD officer. **Exhibit F, 31:17—331**; **Exhibit G, 13:5—14:13**.

37.     There is no dispute that whenever a PPD officer encounters a person armed with a firearm in public, the officer must determine whether that person is lawfully carrying the weapon. **Exhibit F, 31:21-25**; **Exhibit G, 13:10-21**.

38.     After stopping an armed person in public, if an officer cannot verify that the person has a valid gun permit, that person will automatically be arrested and charged with carrying a firearm without a license. **Exhibit F, 31:21-32:7; Exhibit G, 15:1-6.**

39.     PPD officers are not attorneys and rely on Commissioner Outlaw's guidance and training to properly perform their jobs. **Exhibit F, 6:14-15, 33:3-15; Exhibit G, 6:3-9, 16:1-17:10.**