# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
RYAN QUARLES,                  : No. 21-2813
                               :
          Plaintiff,           :
                               :
     vs.                       :
                               :
COMMISSIONER DANIELLE OUTLAW,  :
Et al,                         :
                               :
          Defendants.          :
```

- - -

Monday, January 31, 2022

- - -

Videoconference deposition of RYAN QUARLES was taken, pursuant to notice, before Kathryn Doyle, a Notary Public of the Commonwealth of Pennsylvania, on the above date, commencing at 2:02 p.m.

- - -

STREHLOW & ASSOCIATES
54 FRIENDS LANE, SUITE 116
NEWTOWN, PENNSYLVANIA 18940
(215) 504-4622
WWW.STREHLOWCOURTREPORTING.COM

Ryan Quarles
January 31, 2022

Page 14

1  date on February -- I believe February -- I don't
2  remember the exact date, but I had a court date and
3  I came up here. It was in February, though, early
4  February.
5      Q   Of 2020?
6      A   Yeah.
7          And then I turned around and I had
8  another court date like two weeks later, so I just
9  stayed up here with family.
10     Q   And what was the case for that you had a
11 court date?
12     A   For the case that the lawsuit is for now.
13     Q   Okay. So let me try to clear that up.
14         The incident that we're here for
15 today was your February 2020 arrest, by Officer
16 Ponente and Officer Rozman, right?
17     A   Yes.
18     Q   Okay. So I'm asking prior to that arrest,
19 why were you in Philadelphia?
20     A   I was visiting family.
21     Q   Okay.
22     A   All of my family lives here, so I just
23 come -- I visit family and then go back home like a
24 regular person does.

Page 15

1      Q   Yeah. So when you were visiting family,
2  when did you specifically come up?
3      A   I don't remember -- I don't recall what
4  exact days I came up.
5      Q   So you were arrested by Officers Ponente
6  and Rozman on February 3, 2020.
7          Did you come up to Philadelphia in
8  January 2020?
9      A   No. I wasn't in Philadelphia in January.
10     Q   Okay.
11     A   I came up February.
12     Q   You came up in February.
13         You earlier said: I had a court date
14 in February 2020.
15     A   Yeah.
16     Q   And I asked what case was that for.
17     A   The case that Ponente locked me up for.
18     Q   Okay. So --
19     A   I don't know if I'm getting confused. I
20 don't know. I'm kind of confused, though. I
21 guess -- you said February? Yeah, February 2020.
22         MR. BELL: I think she's asking prior to
23     your encounter with Officers Ponente and
24     Rozman, when did you come to Philadelphia?

Page 16

1          THE WITNESS: Oh. I got arrested in --
2  yeah. I got arrested in February, so -- I
3  wasn't in Philadelphia in January. I came in
4  February. So I came here to visit my family in
5  February, so -- before that, I was in Georgia,
6  though. So I wasn't really here in January. I
7  was here in February.
8  BY MS. ZABEL:
9      Q   Okay. How long were you in Philadelphia
10 before you were arrested by Officers Ponente and
11 Rozman?
12     A   Maybe a weekend.
13     Q   How long were you planning on staying to
14 visit your family?
15     A   No later than like a week or so. I know I
16 had like a week off from work, so I didn't...
17     Q   Okay. You were arrested by Officers
18 Ponente and Rozman on February 3, 2020. So that's a
19 Friday --
20     A   All right.
21     Q   -- if I'm looking at my calendar.
22         Does that refresh your recollection
23 at all about when you arrived in Philadelphia?
24     A   Oh, okay. So it might have been late

Page 17

1  January. I'm sorry about that.
2      Q   Okay.
3      A   Yeah. If I was arrested February 3, it
4  had to be like late January I was here.
5      Q   Okay. Where do you stay when you visit
6  family in Philly?
7      A   Maybe hotels. Sometimes my mom's house,
8  but I have a lot of siblings, so I hate staying
9  there.
10     Q   Do you remember in January 2020 where you
11 stayed?
12     A   Yeah. I stayed at my mom's house, I
13 believe -- yeah, I stayed at my mom's house for
14 about a weekend, just visiting.
15     Q   And is your mom's address, 1629 West
16 Butler Street?
17     A   No.
18     Q   Okay. What's your mom's address?
19     A   It's 216 Sparks Street.
20     Q   Okay. Who lives at 1629 West Butler
21 Street?
22     A   That's my old address when I was going to
23 high school -- I don't know where that address came
24 from, though.

5 (Pages 14 to 17)

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Ryan Quarles
January 31, 2022

Page 18

1  Q  So you haven't lived at that Butler Street
2  address since you were, like, in high school?
3  A  Yeah, yeah.
4  Q  Do you have a driver's license?
5  A  Yeah.
6  Q  And where is the driver's license from?
7  Georgia or Pennsylvania?
8  A  Georgia.
9  Q  Are you registered to vote?
10 A  Yeah.
11 Q  Do you know where you're registered to
12 vote, what state?
13 A  Georgia.
14 Q  I saw in your responses to discovery that
15 you previously were a cable repair technician and
16 installer; is that right?
17 A  Yes.
18 Q  Okay.  For what years did you do that job?
19 A  2017, 2018, 2019 -- for about three years.
20 Q  What company did you work for?
21 A  Xfinity.
22 Q  Where did you work?
23 A  Xfinity.
24 Q  I'm sorry.  That was a poorly worded

Page 19

1  question.
2     I meant where was your job located?
3  A  It was a contracting company in Tucker,
4  Georgia.
5  Q  And why did you stop working that job?
6  A  Because I got arrested and I was held
7  over, so I kind of lost my job.
8  Q  You got arrested in Georgia?
9  A  No.  I had gotten arrested in Philadelphia
10 as I was visiting family.
11 Q  Is that a different arrest than we're here
12 for today, the February 2020 arrest?
13 A  No.  It's the same one.
14 Q  So as of -- you just told me you worked
15 this job 2017 to 2019.
16    As of January 2020, did you still
17 have a job at Xfinity?
18 A  Yeah, yeah.
19 Q  Okay.  Have you been arrested in Georgia
20 before?
21 A  I don't want to talk about an open matter.
22 Q  So this question isn't implicating any of
23 your Fifth Amendments rights.  It's simply asking if
24 you've been arrested in Georgia before?

Page 20

1  A  Yes.
2     MR. BELL:  You can answer that,
3  Mr. Quarles.
4     THE WITNESS:  Yes.
5  BY MS. ZABEL:
6  Q  How many times?
7  A  Once, I believe -- once.
8  Q  When was that?
9  A  2018.
10 Q  I'm going to read to you some of the
11 charges from that, and I just want you to confirm
12 this is the same action that we're talking about.  I
13 have a docket that says in February 2018, you were
14 charged with -- not convicted, but charged with:
15 Armed robbery, aggravated assault with a deadly
16 weapon, possession of a firearm during commission of
17 a felony, financial transaction card fraud,
18 financial identity fraud, and I believe that's it.
19    Is that the same matter that we're
20 talking about?
21 A  Yep.
22 Q  Okay.  When you were arrested for that
23 February 2018 -- when you were arrested in
24 February 2018, did you spend any time incarcerated?

Page 21

1  A  Yeah.  About -- maybe a month.
2  Q  Where were you incarcerated?
3  A  Fulton County.
4  Q  And how were you released?
5  A  They let me go for signature bond.
6  Q  That matter is still pending; is that
7  correct?
8  A  Yeah.  I thought it was over until I got
9  arrested this time, and then somehow it's just open
10 again.  So I don't know what's going on with that.
11 Q  Why did you think it was over?
12 A  I mean, it got like -- I guess, like, I
13 don't know.  It was like -- it disappeared for a
14 second.  I couldn't, like, look up anything from it
15 or anything from 2020 until now.  It was like closed
16 or something -- not closed, but it was like -- I
17 couldn't click on anything.  I didn't have a warrant
18 or anything, so I thought it went away.
19 Q  Do you have a lawyer for that case?
20 A  No.
21 Q  Is anyone from the Public Defender's
22 Office representing you?
23 A  I don't know who the public defender is
24 right about now.  I think -- last time I checked,

6 (Pages 18 to 21)

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Page 22

1  they switched it, so I wouldn't even, like, give you
2  a name and that would be the wrong name.
3      Q   Have you been contacted by any public
4  defender representing you about the case?
5      A   No.
6      Q   Did you ever retain a private attorney for
7  that case?
8          MR. BELL:  I'm going to object on
9      relevance at this point.
10         You can answer the question.
11         THE WITNESS:  Can you repeat the question?
12 BY MS. ZABEL:
13     Q   Did you retain a private attorney for that
14 case?
15     A   No.
16     Q   I'm just looking at a name and you can
17 tell me if this sounds familiar to you at all,
18 Meghan Callier.
19         Do you recall her being your
20 attorney?
21     A   She's not a private attorney, though.
22 She's a court-appointed attorney.
23     Q   Okay.  Were you aware when you signed for
24 your bond, as you say -- you said you did a

Page 23

1  signature bond -- that you weren't allowed to leave
2  the state?
3          MR. BELL:  Objection.  Relevance -- don't
4      answer that, actually.  That's a Fifth
5      Amendment issue, potentially.
6          MS. ZABEL:  So you can only make
7      objections -- speaking objections as to the
8      form of the question, not as to relevance.
9          Having said that, if you're instructing
10     your client to plead the Fifth, that is clearly
11     your right to do so and his right to answer
12     that way.
13         So are you instructing him to plead the
14     Fifth?
15         MR. BELL:  What's the question, again?
16         MS. ZABEL:  Actually, Katie, can you read
17     that back?
18              - - - - - -
19     (Whereupon the court reporter read back the last
20              question.)
21              - - - - -
22         MR. BELL:  Plead the Fifth, Quarles.
23         THE WITNESS:  I plead the Fifth.
24 BY MS. ZABEL:

Page 24

1      Q   Were you aware that the armed robbery
2  charge against you was a felony charge?
3          MR. BELL:  Plead the Fifth.
4          THE WITNESS:  I'll plead the Fifth.
5  BY MS. ZABEL:
6      Q   Are you aware that the aggravated assault
7  with a deadly weapon charge against you was a felony
8  charge?
9      A   Plead the Fifth.
10     Q   Were you aware in signing your signature
11 bond that you were not permitted to carry a firearm?
12     A   I plead the Fifth.
13     Q   Can you tell me the details that led to
14 your arrest in Georgia for the charges that we were
15 discussing?
16         MR. BELL:  Plead the Fifth.
17         THE WITNESS:  Plead the Fifth.
18         I told you I didn't want to discuss an
19     open matter.
20 BY MS. ZABEL:
21     Q   Is it your understanding that you're being
22 extradited back to Georgia at some point for these
23 charges?
24     A   I plead the Fifth.

Page 25

1      Q   Do you have any information about when you
2  will be extradited to Georgia?
3      A   I'm not sure.  I really don't know what's
4  going on, here.  I don't even know why I'm being
5  held.  I probably should have been released from
6  here.
7      Q   Okay.  So let's talk then about your
8  arrest by Officers Ponente and Rozman.
9          Can you tell me what you were doing
10 on February 3, 2020 prior to being arrested?
11     A   I was going to get something to eat.  I
12 was riding with a friend, and I was just driving.
13 And I looked up, and the cops were behind me.
14     Q   Was your friend Nyseem(ph) Smith?
15     A   Yes.
16     Q   And you were the driver?
17     A   Yes.
18     Q   Were you driving your car or Nyseem's car
19 or somebody else's?
20     A   It was his car.
21     Q   Why were you driving?
22     A   I don't know -- because I was driving.
23     Q   Okay.  That's a perfectly fine answer, and
24 it's also -- I should have said -- it's perfectly

Page 26

```
 1    fine if you don't remember certain questions that
 2    I'm going to ask you, too.
 3            Okay.  So you're driving to get food,
 4    and suddenly you realize the cops are behind you; is
 5    that right?
 6       A    Yes.
 7       Q    Okay.  Where were you when you realized
 8    that the police were behind you?
 9       A    It was like on Chew Ave., so in between --
10    maybe like Chew and Locust area -- Chew and Locust
11    Street.
12       Q    And what made you realize that the police
13    were behind you?  Did they have their sirens on or
14    their lights or anything like that?
15       A    I just looked in my mirror.  They didn't
16    have their lights on.  They were just behind me,
17    so...
18       Q    Okay.  So what do you do when you realize
19    that they are behind you?
20       A    Just continue driving, as I was doing.
21       Q    At any point, did you disregard a stop
22    sign?
23       A    No.
24       Q    At any point, did you fail to use your
```

Page 27

```
 1    turn signal while making a turn on to -- at the
 2    intersection of 21st Street and Nedro Ave -- I never
 3    know how to say that.
 4       A    No.
 5       Q    Okay.
 6       A    In fact, the cop wasn't even behind me
 7    until I got to Chew and Locust.
 8       Q    Did you ever try to avoid the police?
 9       A    No.
10       Q    Did you ever increase the car's speed once
11    you saw the police?
12       A    No.
13       Q    At any point, do the police put on their
14    lights and sirens?
15       A    Repeat that again.  Sorry.
16       Q    At any point, did the police put on their
17    lights and sirens on their vehicle?
18       A    Maybe like a block away from Locust, so
19    whatever that cut block is right there in between
20    Locust and Gray.
21       Q    How long after you first noticed the
22    police behind you did they activate their lights?
23       A    Maybe about 30 seconds, maybe -- to a
24    minute, 30 to a minute.
```

Page 28

```
 1       Q    All right.  Once the police put on their
 2    lights and sirens, what do you do?
 3       A    I pull to a dead end so I wouldn't block
 4    traffic and stuff.
 5       Q    Where was that located?
 6       A    On Gray Street right before Chelten
 7    Avenue?
 8       Q    All right.  What happens next?
 9       A    Well, I came to the dead end.  I stopped.
10    I kind of like looked out of my mirror, and he,
11    like, jumped out of car with his gun out and stuff.
12       Q    When you say he, the two officers who
13    arrested you, one was a female and one was a male.
14    So are you referring to Officer Ponente when you
15    say:  He jumped out?
16       A    Yes.
17       Q    Okay.  So Officer Ponente jumps out, you
18    said, with a gun drawn; is that right?
19       A    Yes.  She did the same thing, too, though.
20       Q    Okay.  And you saw all of this from your
21    mirror?
22       A    Yeah.
23       Q    Okay.  What happens next?
24       A    They were just yelling and yelling and
```

Page 29

```
 1    yelling and approaching the car, as well.
 2       Q    Did the officers order you out of the car?
 3       A    Yeah.
 4       Q    What did they say?
 5       A    Get the F out of the car.  Don't move.
 6    Put your hands up -- stuff like that.
 7            So I got out of the car.  I complied
 8    with them.  I put my hands up, and I took a couple
 9    steps backwards towards them.  And I got down on my
10    knee.  That's it.  I was, like, complying with them,
11    also.
12       Q    At the time you were stopped, did you have
13    a firearm on your person?
14       A    Yeah.
15       Q    Where was it located?
16       A    In my pocket.
17       Q    Which pocket, if you remember?
18       A    I believe -- probably my right one.
19       Q    Did you tell the officers you had a gun on
20    you?
21       A    Yeah.  I told them, and I told them I also
22    had my license to carry.
23       Q    When did you tell them that for the first
24    time?
```

8 (Pages 26 to 29)

Page 30

1  A  When he was approaching me.
2  Q  Did you tell them you had a firearm on you
3  in response to a question that they asked or did you
4  tell them proactively?
5  A  Question.
6  Q  What did they say, if you remember?
7  A  He asked me something -- I can't remember,
8  but I did tell them I had a firearm and a license to
9  carry.
10 Q  What happens after you tell them that you
11 have a firearm on you?
12 A  They took the firearm.  They took the
13 license and placed me under arrest -- or detained
14 me.
15 Q  Did he put handcuffs on you?
16 A  Yeah.
17 Q  And where did he put you?
18 A  In the back of a cop car.
19 Q  And where was your friend at this time?
20 A  He got put in a separate cop car, I
21 believe.
22 Q  Okay.  The firearm that they recovered
23 from you, was that your firearm?
24 A  It was a friend's.

Page 31

1  Q  And who was the friend?
2  A  I'd like to not disclose that information.
3  Q  Okay.  You have to, because you're under
4  oath and your lawsuit is about this arrest.
5     MR. BELL:  If you recall, Mr. Quarles,
6  answer the question.
7     THE WITNESS:  I don't recall.  I don't
8  recall.
9  BY MS. ZABEL:
10 Q  You don't remember your friend's name?
11 A  I remember his first name, but I don't
12 remember his last name.  I don't want to give you
13 the wrong name and then -- it's like lying if you
14 give you the wrong name, right?
15 Q  What's his first name?
16 A  Dionte, D-I-O-N-T-E.
17 Q  And why did you have Dionte's gun on you?
18 A  He gave me permission to have it.
19 Q  Why did you ask for his permission to have
20 his gun?
21    MR. BELL:  Objection.  Relevance.  Answer
22 the question.
23    THE WITNESS:  Can you repeat your
24 question?

Page 32

1  BY MS. ZABEL:
2  Q  Why did you ask Dionte for permission to
3  have his gun?
4  A  I don't know.  I just said:  Can I hold
5  it?  He said:  Yeah.  He gave me permission to.
6  Q  Was it for protection?
7  A  It's always for protection.
8  Q  At this point in time, in February 2020,
9  did you own any firearms?
10 A  Yeah.
11 Q  How many --
12    MR. BELL:  Objection.  Relevance.
13 Objection.  Relevance.
14    Answer the question, if you can recall.
15 BY MS. ZABEL:
16 Q  How many firearms did you own?
17 A  One.
18 Q  Did you purchase it in Georgia?
19 A  Yeah.
20 Q  Did you bring that firearm with you when
21 you came up to Philadelphia in January or
22 February 2020?
23 A  No.
24 Q  Why not?

Page 33

1  A  Because I didn't.
2  Q  But then you asked your friend, Dionte,
3  for his gun when you were in Philadelphia, right?
4  A  I mean, he's not from Philadelphia, so --
5  I didn't ask anyone in Philadelphia for a gun, just
6  to be clear.
7  Q  Okay.  So where is Dionte from?
8  A  Georgia.
9  Q  Okay.  So why did you bring Dionte's gun
10 to Philadelphia as opposed to your own gun?
11 A  Because he gave me permission to.
12 Q  I understand he gave you permission.
13    Why did you choose to take his gun
14 over your own gun?
15    MR. BELL:  Objection.  Relevance.
16    Answer the question.
17    THE WITNESS:  I mean, there's nothing
18 saying I can't do that or saying it's illegal
19 or something.
20 BY MS. ZABEL:
21 Q  No.  The question is why you preferred to
22 take one gun over another?
23 A  I mean, does that really matter why?
24 Q  Yeah.  Because part of the suit that you