# EXHIBIT F



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

RYAN QUARLES,

      Plaintiff,

vs.                         Civil Action No. 21-cv-02813

COMMISSIONER OUTLAW, et al.

      Defendants.

_____





**REMOTE DEPOSITION BY VIDEOCONFERENCE**

**OFFICER MATTHEW PONENTE**

**TAKEN ON**
**JANUARY 4, 2022**
**10:06 A.M.**



**(800) 528-3335**
**NAEGELIUSA.COM**

**477 KRAMS AVENUE**
**PHILADELPHIA, PENNSYLVANIA 19128**

2

1                APPEARANCES BY VIDEOCONFERENCE
2
3    Appearing on behalf of the Plaintiff:
4    AARON BELL, ESQUIRE
5    Bell Law Offices
6    7303 Frankford Avenue
7    Philadelphia, PA  19136
8    (215)609-4888
9    (833)683-1636 (Fax)
10   aaronbelllawfirm@gmail.com
11
12   Appearing on behalf of the Defendant:
13   SHANNON ZABEL, ESQUIRE
14   City of Philadelphia Law Department
15   1515 Arch Street, 14th Floor
16   Philadelphia, PA  19102
17   (215)683-5433
18   Shannon.Zabel@phila.gov
19
20   Also Present:
21   Mark Nilson, Videoconference Technician
22
23
24
25

4

1                    EXHIBITS INDEX
2    Exhibit                        Page
3
4               (NONE MARKED)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1                 EXAMINATION INDEX
2                               Page
3
4    EXAMINATION BY MR. BELL            6
5
6    EXAMINATION BY MS. ZABEL          37
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1        REMOTE DEPOSITION BY VIDEOCONFERENCE
2            OFFICER MATTHEW PONENTE
3                    TAKEN ON
4                JANUARY 4, 2022
5                 10:06 A.M.
6
7        THE REPORTER:  Officer Ponente, can I
8    please have you raise your right hand and let me
9    know when you've done so.
10       THE DEPONENT:  Yes, I've done so.
11       THE REPORTER:  Do you solemnly swear or
12   affirm under the penalty of perjury that the
13   testimony you are about to give will be the truth,
14   the whole truth, and nothing but the truth?
15       THE DEPONENT:  I do.
16       THE REPORTER:  Perfect.  Thank you.
17       And, Counsel, for the record, please state
18   your names and whom you represent.
19       MR. BELL:  Aaron Bell.  I represent Ryan
20   Quarles.
21       MS. ZABEL:  And Shannon Zabel on behalf of
22   Defendants Commissioner Outlaw, Officer Ponente, and
23   Officer Razman.
24       THE REPORTER:  Thank you, Counsel.  You
25   may proceed.

6

1  MATTHEW PONENTE, having been duly sworn, was
2  examined, and testified as follows:
3  EXAMINATION
4  BY MR. BELL:
5      Q.  All right.  Good morning, Officer Ponente.
6      A.  Good morning.
7      Q.  Hey, Officer, can you activate your video?
8      A.  Yes.
9      Q.  Thank you. If you don't understand any of
10  my questions, let me know and I'll rephrase it.  I'm
11  going to get right to the point so I'm not going to
12  waste your time with a bunch of ridiculous
13  questions.
14          What is your highest level of education?
15      A.  High school.
16      Q.  Okay.  How long have you been a police
17  officer?
18      A.  Five years.
19      Q.  Okay.  Can you explain the -- the process
20  of verifying a gun license in Pennsylvania?
21      A.  The process of verifying a gun license in
22  Pennsylvania?  Normally, it's through the NCIC/PCIC
23  system.
24      Q.  Okay.  All right.  Can you explain how
25  were you trained to verify a gun license from the

7

1  State of Georgia?
2      A.  Through the same way you would a
3  Pennsylvania license, through the NCIC/PCIC system.
4      Q.  Okay.  So according to your training that
5  the Philadelphia Police Department provided you
6  concerning Georgia permits, you verify it the same
7  way you would verify a Pennsylvania license?
8      A.  Correct.
9      Q.  All right.  And just to be a little
10  clearer because I could have asked a better
11  question, is there a specific policy that the
12  Philadelphia Police Department has concerning
13  Georgia permits that you're aware of?
14      A.  Not that I'm aware of.
15      Q.  All right.  You briefly mentioned the
16  information centers, the PCIC and the NCIC.  Those
17  are like fusion centers, correct?
18      A.  Correct.
19      Q.  In a way.  All right.  Can you explain
20  what a fusion center is?
21      A.  Fusion centers are -- they're able to run
22  further information, more than I am on just my
23  computer.
24      Q.  Okay.  All right.  So all right.  So the
25  PCIC, that refers to the Pennsylvania's Criminal

8

1  Intelligence Center, which is a fusion center,
2  correct?
3      A.  Correct.
4      Q.  And a CDI, that would be generally a local
5  police department's criminal intelligence division?
6      A.  Correct.
7      Q.  All right.  Okay.  So when we talk about
8  these information centers, all right, so because
9  there's just something -- like in Georgia they have
10  a general fusion center.  You know that, right?
11      A.  I, I -- could you say that one more time?
12  I'm sorry?
13      Q.  All right.  You know, I'll ask you a
14  better question.
15          Let's talk about 911 dispatch.  What are
16  the responsibilities of the 911 dispatch officers to
17  the best of your knowledge?
18      A.  What are their responsibilities?
19      Q.  Yeah, yeah.  I mean, I know you're not a
20  911, just to be clear, I know you're not, you're not
21  a 911 dispatch officer, but would you tell me what
22  you know about their responsibilities?
23      A.  About a 911 dispatcher being -- as far as
24  I'm concerned, they dispatch 911 calls that they
25  received from intake.

9

1      Q.  All right.  So basically the 911 hotline,
2  that's for the members of the public to report
3  emergencies pretty much?
4      A.  Correct.
5      Q.  As a sworn police officer, you're sworn
6  and you're certified to be a peace officer in the
7  State of Pennsylvania, right?
8      A.  Correct.
9      Q.  Would you agree that you have more
10  training and I guess general law enforcement
11  qualifications than a 911 operator would?
12      A.  Correct.
13      Q.  To the best of your knowledge?  I'm sorry.
14      A.  Yes.
15      Q.  All right.  If you had to rank as far as,
16  like, sources of information, what would be your
17  best source of information if you're investigating a
18  -- a subject?  Would it be a fusion center or would
19  it be a 911 dispatch officer?
20          MS. ZABEL:  I'll object to the form but,
21  Officer, you can answer.
22          THE DEPONENT:  A fusion center will tell
23  me more about the individual.
24  BY MR. BELL:
25      Q.  All right.  In Pennsylvania, would you



10

1 attempt to verify a gun license by calling the 911
2 hotline?
3     A.  No, I would call the fusion center.
4     Q.  All right.  Why did you think Mr. Quarles'
5 firearm license was faked?
6     A.  I didn't -- I never said it was fake.  I
7 was calling to verify the validity of it.
8     Q.  All right.  Did you have opportunity to
9 review your body cam?
10     A.  I did not.
11     Q.  All right.  Would you dispute if, if I
12 said your body cam shows that you said you think
13 it's fake, the license is fake, would you dispute
14 that?
15     A.  Like I said, I haven't been able to review
16 it so to the best of my knowledge I don't, I don't
17 recall saying that the license was fake.
18     Q.  Okay.  Prior to encountering Mr. Quarles,
19 have you ever encountered a Georgia license to
20 carry?
21     A.  Yes.
22     Q.  Okay.  And in that case you were able to
23 verify it that it was either valid or invalid?
24     A.  Correct.
25     Q.  Do you remember the case name?  Do you --

11

1     A.  No, I do not.
2     Q.  When did this happen?
3     A.  When did what happen?
4     Q.  When did you encounter a Georgia gun
5 license prior to Mr. Quarles' case?
6     A.  Several years ago.
7     Q.  Okay.  And just to be clear, you verified
8 whether this license was valid according to the same
9 procedure you used in this case?
10     A.  Yes, through the fusion centers.
11     Q.  Okay.  And when you say "several years",
12 can you -- can you pinpoint a year?
13     A.  Either --
14     Q.  What year specifically?
15     A.  -- either 2017 or 2018.
16     Q.  Okay.  Okay.  Did you think anything was
17 unusual about Mr. Quarles' gun license when you
18 looked at it?
19     MS. ZABEL:  I'll object to the form but,
20 Officer, you can answer.
21     THE DEPONENT:  No.
22 BY MR. BELL:
23     Q.  So it looked perfectly legit when you
24 looked at it?
25     MS. ZABEL:  Objection to the form.

12

1     Officer, you can answer.
2     THE DEPONENT:  I mean, I'm not trained on
3 exactly Georgia permits per se, but to the naked eye
4 it looked legitimate.
5 BY MR. BELL:
6     Q.  Okay.  When police arrest someone for a
7 serious crime, you take that person into police
8 custody to be processed, correct?
9     A.  Correct.
10     Q.  Now, prior to arresting someone you need
11 to have a reason to believe that that person
12 committed a crime?
13     A.  Correct.
14     Q.  And that would -- basically, that reason
15 would essentially be probable cause, right?
16     MS. ZABEL:  Objection, calls for a legal
17 conclusion.
18     Officer, you can answer to the best of
19 your ability.
20     THE DEPONENT:  I guess, yeah, that's
21 correct.
22 BY MR. BELL:
23     Q.  Yeah, Officer, this is not a trick
24 question.  You, as a trained officer, you know what
25 probable cause is, correct?

13

1     A.  Right.
2     Q.  Yeah, that's all I was asking.  So you
3 can't just arrest someone unless you have probable
4 cause to believe a crime happened.  That's all I'm
5 asking.  You agree with that?
6     A.  Okay.  Correct.
7     Q.  All right.  I have a couple of questions
8 about the Georgia Fusion Center.
9     Do you recall talking to the Georgia DBI
10 officer, right?
11     A.  Well, I recall talking to several
12 different people --
13     Q.  Yes.
14     A.  -- during the investigation, yes.
15     Q.  Okay.  When you -- when you were finally
16 able to get to -- to reach the Georgia Fusion
17 Center, you talked to a male from the DBI?
18     A.  Correct.
19     Q.  Right, and this is the person who
20 connected you to Gwinnett County Dispatch?
21     A.  Right.
22     Q.  All right.  So this DBI officer, he
23 informed you that he doesn't have -- there's no
24 database with which to check a firearm license,
25 right?



14

1    A.   Right, from what I recall.
2    Q.   All right.  Do you also recall him saying
3  that the courthouse -- you had to contact the
4  courthouse?
5    A.   I don't recall.
6    Q.   All right.  Now, if that's on your body
7  cam you wouldn't object -- you wouldn't disagree
8  with that if it's depicted on your body cam that the
9  officer --
10   A.   Yeah, if it's on my body camera then,
11  yeah, I wouldn't -- I wouldn't dispute that.
12   Q.   All right.  All right.  Now, when you
13  contacted the 911 operator in Gwinnett County -- you
14  remember that, right, your discussion with her?
15   A.   I remember contacting Gwinnett County's
16  dispatch, yes.
17   Q.   Okay.  And the dispatch officer you spoke
18  to, to be clear, it was a 911 dispatch officer,
19  right?
20   A.   From what I recall.  Again, I, I have not
21  been able to review my body camera.
22   Q.   All right, all right.  You didn't talk to
23  Gwinnett County CDI, right?
24   A.   I do not recall.
25   Q.   Okay.  Do you recall the Gwinnett County

15

1  dispatch officer telling you at least on three
2  occasions that she doesn't have access to gun permit
3  records?
4    A.   Again, I don't recall.
5    Q.   Okay.  Would you like to take a moment to
6  review your body cam and we could come back?
7    A.   I've attempted to review it and I was
8  unable to on my cell phone.  I attempted to review
9  it last night.
10   Q.   Okay.  And are you deliberately, and this
11  is not a personal attack, are you deliberately not
12  having a recollection or you just simply don't
13  recall?
14       MS. ZABEL:  Objection.
15       Officer, you can answer, go ahead.
16       THE DEPONENT:  This happened over a year
17  ago.  I don't recall every individual person I spoke
18  to, what their position was, and what was said by
19  them.
20  BY MR. BELL:
21   Q.   Okay.  But -- all right.  And you're not
22  disputing your body cam.  If your body cam shows
23  that this operator told you that we don't have gun
24  permit records multiple times, you wouldn't, you
25  wouldn't contest that, right?

16

1    A.   Okay.
2    Q.   Okay?  That means yes?
3    A.   Yes.
4    Q.   All right.  Do you recall the Gwinnett
5  County operator -- or you asking the Gwinnett County
6  911 operator if -- if -- if Georgia Police ran
7  someone through their PCI/NCIC system for a permit
8  carry status, nothing would come back?  Do you
9  recall that?
10   A.   Yeah, I recall that.
11   Q.   All right.  At any point did you mislead
12  your fellow officers at the scene of the arrest in
13  this case?
14       Can you ask that again?
15   Q.   At any point did you mislead your
16  colleagues about what Georgia officials told you
17  about how to verify a gun license?
18       MS. ZABEL:  Objection to the form.
19       Officer, you can answer.
20       THE DEPONENT:  Mislead in what way?
21  BY MR. BELL:
22   Q.   Okay.  Now, did you tell either Officer
23  Razman, the sergeant who was at the scene, or anyone
24  else who was at the scene that the GBI Fusion
25  officer told you that law enforcement don't have

17

1  access to gun permit records?
2    A.   Again, I don't recall.
3    Q.   Okay.  Okay, Officer.  Do you recall your
4  discussion with Detective Rose?
5    A.   Yes.
6    Q.   Okay.  Did you tell Detective Rose that
7  the Georgia Fusion officer told you law enforcement
8  don't have access to gun permit records in Georgia?
9    A.   No, I don't remember that information.
10   Q.   What specifically do you remember telling
11  Detective Rose?
12   A.   I remember telling Detective Rose that the
13  -- that your client did not have a valid permit out
14  of Georgia.  Detective Rose was able to tell me that
15  he was able to look into any prior arrests in
16  Georgia and saw, like, a prior arrest for robbery.
17   Q.   And he told you that knowing your
18  discussion now was recorded on the body cam?
19   A.   That was not recorded on body camera.
20   Q.   Okay.  So you told -- your body cam, it
21  shows you, you would agree that it shows you telling
22  Detective Rose that Georgia denied that Mr. Quarles
23  had a valid permit?
24   A.   You're asking if my body camera shows
25  that?



18

1    Q.   Yes.
2    A.   No, I don't recall.  If anything, from
3  what I can recall, my body camera would have been
4  off when I spoke to Detective Rose.
5    Q.   Oh.  So you're not aware that it was
6  actually recorded?
7    A.   No, I'm not.
8    Q.   Okay.  Can you turn your sound off on your
9  body cam and turn it on when you want to?
10    A.   Can I turn the sound off?  I mean --
11    Q.   Yeah, off and on.
12    A.   If nothing's recording at that point.
13    Q.   All right, but -- okay.  Now, look, sorry
14  about that.  Hold on one second.  All right.  So if
15  something is recorded, right, let's assume your body
16  -- you activate your body cam, do you have the
17  ability to switch the volume on and off or the audio
18  on and off?
19    A.   No.
20    Q.   Okay.  Did you -- you know giving false
21  information to a law enforcement officer is a crime,
22  right?
23    A.   Yes.
24    Q.   You know fleeing and alluding police
25  officers is -- in a high speed chase, that, that's a

19

1  crime, right?
2    A.   Correct.
3    Q.   You didn't arrest Mr. Quarles for
4  furnishing a false ID, right?
5    A.   I don't, I don't apply any charges.
6    Q.   Okay.  But you didn't take him into
7  custody for giving you a false ID, right?
8    A.   No.
9    Q.   You didn't take him into custody for
10  fleeing and alluding officers?
11    A.   I'm -- I'm not sure if that charge was
12  added on or not.
13    Q.   Yeah, well, I'm not asking about the
14  charging process.  I mean, like, would you take him
15  -- when you decided to take him into custody it
16  wasn't for fleeing and alluding officers?
17    A.   That's correct.
18    Q.   All right.  Why did you stop Mr. Quarles?
19    A.   Disregarding a stop sign.
20    Q.   Okay.  Now, when you stopped Mr. Quarles
21  for disregarding a stop sign, at any point did he
22  draw his pistol at you?
23    A.   Not to my knowledge.
24    Q.   All right.  He didn't attack you in any
25  way, right?

20

1    A.   No.
2    Q.   All right.  So he was compliant?
3    A.   No.
4        MS. ZABEL:  Objection to the form.  Go
5  ahead.
6        THE DEPONENT:  No, he was not compliant.
7  I don't -- I don't -- I don't understand where
8  fleeing and alluding is considered compliant.
9  BY MR. BELL:
10    Q.   Okay.  So he did not comply with you.
11  When you pulled him over, he was -- he, he fought
12  you, right?  That's what you're saying?
13        MS. ZABEL:  Object to the form.
14        Officer, you can answer.
15        THE DEPONENT:  What time when I pulled him
16  over?  When I initially got behind him or when he
17  got caught in a dead end and stopped?
18  BY MR. BELL:
19    Q.   When he got trapped like a rat, I guess,
20  in this dead end and couldn't get away from you.
21        MS. ZABEL:  Objection to the form.
22        Officer, go ahead.
23        THE DEPONENT:  No, he was taken into
24  custody with no incident.
25  BY MR. BELL:

21

1    Q.   Okay.  So "no incident" meaning he didn't
2  attempt to fight you; he complied, he surrendered,
3  right?
4    A.   Yes.
5    Q.   All right.  So disregarding a stop sign,
6  that's not a violent offense?
7    A.   Correct.
8    Q.   At the time that you took Mr. Quarles out
9  of his car, what evidence did you have to believe
10  that he was armed and dangerous, if anything?
11    A.   Treat every individual as if they're armed
12  and dangerous 'til proven -- proven otherwise.
13    Q.   Oh, so you just assume that individuals
14  are armed and dangerous?
15    A.   Again, I'm going off of him fleeing and
16  alluding, so --
17    Q.   Can you explain -- can -- can you describe
18  his fleeing and alluding?
19    A.   When I got behind your client, he
20  proceeded to flee at a high rate of speed.  He went
21  into oncoming traffic on the wrong, wrong side of
22  the road.  He sideswiped a car on the wrong side of
23  the road.  He disregarded all and any stop signs,
24  red lights, anything at all that was in the road to
25  -- in an attempt to evade police.



22

1    Q.   Did you take pictures of this car that he
2    sideswiped?
3    A.   No.
4    Q.   Were you able to locate this vehicle?
5    A.   No.
6    Q.   What color was the car that he sideswiped
7    in his dangerous encounter?
8    A.   I don't recall.
9    Q.   Was it a car?  Was it a minivan?  Was it a
10   Bentley?  What was it?
11   A.   I don't recall.
12   Q.   When he sideswiped this car, did you
13   notice any damage on his vehicle?
14   A.   I believe there was some damage, yes.
15   Q.   What side?
16   A.   On the passenger side.
17   Q.   Passenger side.  And did the -- did his
18   car contact this vehicle, this unknown vehicle, I
19   guess towards the front or the back?  So, basically,
20   what -- did his mirror get knocked off in any way?
21   A.   Did the mirror get knocked off?  I don't
22   recall --
23   Q.   Yeah, Mr. Quarles'.
24   A.   I don't recall.
25   Q.   How hard was the impact?

23

1    A.   I mean, he -- he tried to wedge between a
2    car that was in the lane at the red light and then a
3    car that was parked, and he sideswiped a car that
4    was parked.
5    Q.   Hmm.  So it was in tight quarters
6    basically?
7    A.   Yes.
8    Q.   All right.  And his mirror didn't get
9    knocked off at all?
10   A.   I don't recall if the mirror was knocked
11   off.
12   Q.   Would you be surprised if there's no
13   damage to the paint on his vehicle?
14   A.   I would be surprised, yes.
15   Q.   Do you recall pointing out this damage to
16   his vehicle to your -- your colleagues at the scene
17   of -- of the arrest in this case?
18   A.   I don't recall.
19   Q.   This dangerous, I guess, your initial
20   encounter with him -- it was, it was very dangerous
21   if he's running from you and sideswiping vehicles;
22   you agree?
23   MS. ZABEL:  Object to the form.
24   Go ahead and answer if you can, Officer.
25   THE DEPONENT:  Yes.

24

1    BY MR. BELL:
2    Q.   All right.  Drawing your firearm is
3    considered a use of force, according to the
4    Philadelphia Police Department policy directives.
5    MS. ZABEL:  Pardon me.  Mr. Bell, are you
6    talking about current directives or directives that
7    were in place at the time of this arrest in February
8    2020?
9    MR. BELL:    All right.  What are the --
10   when have the directives been updated, Ms. Zabel, to
11   your knowledge?  Because the one I have I think it's
12   10-point something and it said it was -- came out in
13   2000-either '18.  I don't have it right in front of
14   me, but --
15   THE DEPONENT:  No, those, those were
16   changed in -- those were changed around the summer
17   time, fall of 2020; after the George Floyd riots
18   those were implemented.
19   BY MR. BELL:
20   Q.   Okay.  So what does your directive say
21   about the
22   use of force now concerning drawing a pistol?
23   A.   Now, now it warrants a use of force to be
24   completed.
25   Q.   Okay.  And that's a use of force memo?

25

1    A.   Correct.  At the time of this arrest, that
2    was not in the directives.
3    Q.   Okay.  So if I have directives, if I have
4    directives prior to -- immediately, the ones
5    immediately prior to the ones that were in force now
6    -- strike that.
7    Ignore that.
8    To be clear, you --
9    MS. ZABEL:  Sorry, Mr. Bell, just for --
10   just for clarification, so I think you're talking
11   about Directive 10.2.  The effective date of it is
12   2015; there's an updated date of, like, December
13   2021, and that includes that use of force, that a
14   firearm being pointed is now considered a use of
15   force and a form should be filled out.  I can send
16   you a copy of that if you want.
17   MR. BELL:  Yes, please.
18   MS. ZABEL:  Okay.
19   BY MR. BELL:
20   Q.   Why did you think drawing your firearm was
21   necessary in this case, Officer Ponente?
22   A.   I had just stopped someone who fled from
23   me, so I didn't know what I was encountering.
24   Q.   Okay.  When you -- when you ran Mr.
25   Quarles' firearm to see if it came back registered,

26

1  what happened?
2      A.  I don't recall.
3      Q.  Were you suspicious -- all right.  Would
4  you -- would you disagree with your -- if I said
5  your body cam showed that you -- you thought Mr.
6  Quarles, I guess, was suspicious because when you
7  ran his firearm it didn't come back to a registered
8  owner.  Would you agree with that?
9      A.  That -- that could happen, yes.
10     Q.  Okay.  Are you aware that Pennsylvania
11 prohibits a registration, a law enforcement registry
12 of firearms ownership?
13     A.  There are still -- through the fusion
14 centers you're still able to see who the registered
15 owner of the firearm is.
16     Q.  Yes.  All right, all right.  But you
17 understand that under State law he don't have to
18 register his firearm with anyone?
19     A.  Right.  I understand but I'm still able to
20 check who the owner is because if I do recall
21 correctly he stated at one point, again, I would
22 have to review my body camera, he may have stated at
23 one point that it's, it was his friend's firearm.
24     Q.  All right.  And you know it's -- it's
25 totally legal to have your friend's firearm if you

27

1  have a license to carry on the public --
2      A.  Right.
3      Q.  -- street?
4      A.  That's correct.
5      Q.  So why did that cause you to be
6  suspicious?
7      A.  I run every single firearm that I get.
8      Q.  All right.  So if -- if every single
9  firearm or if a particular fire arm doesn't come
10 back, that would arise suspicion in you?
11     A.  No.
12     Q.  So why were you suspicious in this case?
13     A.  Again, because your client fled from
14 police.
15     Q.  When you talked to the sergeant at the
16 scene, you didn't tell him that -- according to your
17 body cam, you didn't tell him that he fled from the
18 police and that's why you were suspicious.
19     A.  Okay.  I don't recall.
20     Q.  All right.  So if the body cam shows that,
21 you -- you're not contesting it?
22     A.  Correct.
23     Q.  When you -- when you had the teletype sent
24 to Georgia, you had front desk, the Philadelphia
25 Police Department front desk send a teletype?

28

1      A.  I guess.  Again, I don't recall exactly
2  who sent it.  It could've been the radio room, it
3  could've been the front desk.  I don't recall.
4      Q.  Front desk refers to what?
5      A.  Well, I guess the radio room front desk
6  and there's different -- you have dispatch, you have
7  radio room, you have front desk.  It's -- I don't
8  know who sent the teletype.
9      Q.  You said you -- on your bodycam, so you're
10 talking to a supervisor from the front desk.
11     A.  Okay.
12     Q.  All right?
13     A.  Okay.
14     Q.  So at the time who did you believe the
15 front desk was?
16     A.  Well, if my body cam says that I'm talking
17 -- that I was talking to a supervisor from the front
18 desk then I would assume that's who sent the
19 teletype.
20     Q.  Okay.  Which front desk?
21     A.  My front desk.
22     Q.  The one -- it wasn't your radio room,
23 you'd agree with that because you called your radio
24 room.  Your radio room said they couldn't do that;
25 you've got to go through the front desk.

29

1      A.  Okay.  Then I went to the front desk.
2      Q.  All right.  And the front desk would be
3  what?
4      A.  The front desk would be a supervisor from
5  radio or from communications, if you would.
6      Q.  All right.  And where is communications
7  located?
8      A.  I don't know.
9      Q.  Were you disciplined in any way for your
10 conduct in this case?
11     A.  No.
12     Q.  Were you admonished or were you warned by
13 any supervisors at any time?
14     A.  No.
15     Q.  Did anyone ever tell you -- did anyone
16 ever give you advice on how to deal with a Georgia
17 permit?
18     A.  No.
19     Q.  After this incident?
20     A.  No.
21     Q.  Are you currently -- you're currently
22 aware that Mr. Quarles' gun license was valid the
23 whole time?
24         MS. ZABEL:  Objection to the form; valid
25 when?  When he was arrested in February?

30

1        MR. BELL:  Yes, yeah.  To be clear, yes.
2    Sorry about that.
3    BY MR. BELL:
4        Q.   Are you, Officer Ponente, are you aware
5    now that Mr. Quarles' gun license was valid at the
6    time that you encountered him?
7        A.   Yes.
8        Q.   Not, not that you were aware then; I'm
9    talking about now.
10       A.   Right.
11       Q.   All right.  So -- and it's not a trick
12   question.  So are you aware -- are you aware now
13   that Georgia's laws require an officer to call the
14   judge or call the courthouse to verify a gun
15   license?
16       A.   I'm not aware of Georgia laws.
17       Q.   All right, all right.  Is it fair to say
18   that at the time you encountered Mr. Quarles you, to
19   the best of your training and knowledge, you
20   attempted to verify whether this -- his license to
21   carry was valid or not?
22       A.   Correct.
23       Q.   So you weren't trying to just railroad
24   this man into jail?
25       MS. ZABEL:  Objection to the form.

31

1        You can answer, Officer.
2        THE DEPONENT:  That's correct.
3    BY MR. BELL:
4        Q.   One moment, Officer.  You aren't able to
5    verify Georgia's gun -- Quarles' Georgia gun permit,
6    according to Georgia specific procedure because
7    nobody taught you how to do that.  Would you agree
8    with that?
9        A.   That's correct.
10       Q.   Now, if you were aware you would have
11   followed the procedure; that's why you were on the
12   phone making calls and trying to verify it, right?
13       MS. ZABEL:  Objection to the form.
14       You can answer, Officer.
15       THE DEPONENT:  Yeah, sure.
16   BY MR. BELL:
17       Q.   How often -- or you know what?  Is
18   verifying firearm licenses a important part of your
19   job?
20       A.   Yes.
21       Q.   Every time you encounter someone on a
22   public street who you lawfully stop and they have a
23   firearm, you -- you are required to determine
24   whether that person has a license to carry?
25       A.   Yes.

32

1        Q.   If a person doesn't have a license to
2    carry, they go to jail?
3        A.   Correct.
4        Q.   If you can't verify that a person's
5    license to carry is in fact legitimate, that person
6    goes to jail?
7        A.   Correct.
8        Q.   In a given week, how many times would you
9    say you had to verify whether someone has a valid
10   license to carry?
11       A.   It could be a couple of times, could be
12   none at all.
13       Q.   Okay.  In a given year how many?  I know
14   you probably don't -- I'm not expecting you to know
15   the exact number, but how often is it?
16       A.   In a year it could be dozens of times.
17       Q.   Every time you make a gun arrest, right?
18       A.   Yes.
19       Q.   And you made how many gun arrests on
20   average you think you make in a year?
21       A.   Twenty to --
22       MS. ZABEL:  Objection, asked and answered.
23       Go ahead.  Sorry, didn't mean to cut you
24   off.
25       THE DEPONENT:  -- 30.  Okay.  Twenty to

33

1    30.
2    BY MR. BELL:
3        Q.   The manner in which you attempted to
4    verify Mr. Quarles' gun license is consistent with
5    the generally accepted practices and training
6    provided by the Philadelphia Police Department?
7        A.   Yes.
8        Q.   So the way you attempted to verify Mr.
9    Quarles' gun license would've been just the way you
10   were taught to verify the gun license?
11       A.   Through the --
12       MS. ZABEL:  Objection, asked and answered.
13       Go ahead, Officer.
14       THE DEPONENT:  Through the Fusion Center,
15   through the Pennsylvania Fusion Center.
16   BY MR. BELL:
17       Q.   All right.  In your experience and
18   training as a law enforcement officer, law
19   enforcement officials typically have access to gun
20   permit records.
21       MS. ZABEL:  Is that a question?
22       MR. BELL:  Yeah, that's a question.
23       THE DEPONENT:  Well, can -- can you repeat
24   the question?
25   BY MR. BELL:



34

1    Q.   Yeah, certainly.  Law enforcement -- in
2  your understanding as a law enforcement officer, you
3  -- you understand law enforcement officers typically
4  have access to gun permit records, right?  I know it
5  sounds crazy but it's really simple.  It's not a
6  trick question.
7    A.   To what -- I mean, to what extent?  Do I -
8  - I don't --
9    Q.   Okay.  All right.  Well, basically, law
10 enforcement would have -- you understand law
11 enforcement to typically have gun permit records for
12 the purpose of being able to verify whether somebody
13 has a gun permit, right?
14   A.   Okay.
15   Q.   I'm not saying that the -- to be clear,
16 the question isn't saying -- isn't asking whether
17 police officers, every officer has someone's gun
18 permit records in his cell phone or something like
19 that.
20       What I'm saying is, it's your
21 understanding that a fusion center would typically
22 be able to verify a gun license, correct?
23   A.   A fusion center, yes, correct.
24   Q.   Yes.  So would it be unusual in your
25 opinion -- in your opinion, would it be unusual for

35

1  police not to be, not to be -- not to have that
2  information, a fusion center not to have that
3  information concerning a gun permit?
4       MS. ZABEL:  Objection.  Do you mean the
5  Pennsylvania Fusion Center or any fusion center?
6       MR. BELL:  Fusion centers generally.  The
7  law enforcement fusion center generally to his
8  understanding.
9       THE DEPONENT:  Well, there's not just one
10 law enforcement fusion center --
11 BY MR. BELL:
12   Q.   Yeah, I know.  I know, I know.
13      THE REPORTER:  Counsel, I just want to
14 remind everybody I need everybody to speak one at a
15 time.  I'm taking everybody's voices down, so thank
16 you.
17      MS. ZABEL:  Will do.  Sorry, Jordan.
18 BY MR. BELL:
19   Q.   Officer, have you ever heard of a
20 procedure, a gun permit verification procedure
21 similar to Georgia's where you have to call the
22 judge?
23   A.   No.
24      MS. ZABEL:  Objection, asked and answered.
25 He already said he didn't know Georgia's laws.

36

1  BY MR. BELL:
2    Q.   So the answer was no?
3    A.   Correct.
4    Q.   Is there anything about Mr. Quarles' race
5  that caused you to believe his license was invalid?
6  You --
7    A.   No.
8    Q.   Basically, did you believe his license was
9  not valid because he is black?
10   A.   No, that is not correct.
11   Q.   All right.  So you don't have any racial
12 animus towards Mr. -- towards black people, right?
13   A.   No, I do not.
14   Q.   All right.  You're not a member of the
15 Proud Boys and never were, were you?
16   A.   No, I'm not and I never was.
17   Q.   So if Mr. Quarles was white would you
18 treat him with the same courtesy as you did in this
19 case?
20   A.   Yes.
21   Q.   Okay.  All right.  When is somebody --
22 when would a reasonable person believe that they're
23 arrested?
24      MS. ZABEL:  Objection.  How can he know
25 what a reasonable person would think?

37

1       MR. BELL:  He can answer to the best of
2  his abilities.
3  BY MR. BELL:
4    Q.   To the best of your abilities, Officer,
5  can a --
6    A.   I've never -- I've never been arrested so
7  I don't know when -- when somebody would say --
8    Q.   So you wouldn't have an idea of when a
9  reasonable person would believe that they're
10 arrested?
11   A.   No, I wouldn't have an idea.  Maybe as
12 soon as the handcuffs go on, maybe as soon as they -
13 - I drive off with them in my car.  I don't, I don't
14 know.
15      MR. BELL:  All right.  That's all I have
16 for you, Officer.  Thank you.
17      THE DEPONENT:  Thank you.
18      MS. ZABEL:  Officer, I just have a quick
19 question for you.
20 EXAMINATION
21 BY MS. ZABEL:
22   Q.   So you mentioned that you had roughly 20
23 to 30 gun arrests in a year on average, right?
24   A.   Yeah, give or take.
25   Q.   Okay.  What percentage of those gun



38

1  arrests would you say are for people who don't have
2  gun permits in Pennsylvania or have invalid gun
3  permits from Pennsylvania?
4      A.   More like 95 percent of those are just
5  straight do not have permits or never have.  I'll
6  get an occasional one that has a revoked permit.
7      Q.   Okay.  And the occasional ones where you
8  have revoked permits, generally where are they from?
9      A.   Generally I see them from Pennsylvania.
10         MS. ZABEL:  Okay.  Those are all the
11  questions I have for you.  Mr. Bell might have
12  follow-up.
13         THE DEPONENT:  Okay.
14         MR. BELL:  No follow-up.
15         MS. ZABEL:  Okay.
16         THE REPORTER:  Okay, counsel.
17         MS. ZABEL:  That is all then.
18         THE REPORTER:  Are you ready to go off the
19  record?
20         MS. ZABEL:  Yes, thank you.
21         THE REPORTER:  And before we go off the
22  record, Mr. Bell, would you like the original of
23  this transcript?
24         MR. BELL:  Yes, please.
25         THE REPORTER:  And, Ms. Zabel, would you

39

1  like a copy?
2          MS. ZABEL:  Yes.  Could I get an
3  electronic?  Do you do minis?
4          THE REPORTER:    Yes.
5          MS. ZABEL:  Yes, if I could do that, that
6  would be great.  Thank you.
7          THE REPORTER:  Okay.  E-tran mini.  I've
8  made note of that.
9          The time is 10:44 a.m.  We are now off the
10  record.
11         (WHEREUPON, the deposition of OFFICER
12  MATTHEW PONENTE was concluded at 10:44 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

40

1              CERTIFICATE
2
3      I, Jordan Weems, do hereby certify that I reported all
4  proceedings adduced in the foregoing matter and that the
5  foregoing transcript pages constitutes a full, true and
6  accurate record of said proceedings to the best of my
7  ability.
8
9      I further certify that I am neither related
10  to counsel or any party to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand this
14  19th day of January, 2022.
15
16
17
18
19
20  /S/  Jordan Weems
21
22
23
24
25

41

1          CORRECTION SHEET
2  Deposition of: Ofc. Matthew Ponente    Date: 01/04/22
3  Regarding:    Quarles vs. Commissioner Outlaw
4  Reporter:    Weems/Tate
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page. Sign this sheet on the line provided.
10  Page  Line  Reason for Change
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24          Signature_____
25              Ofc. Matthew Ponente

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

42

```
 1          DECLARATION
 2  Deposition of: Ofc. Matthew Ponente    Date: 01/04/22
 3  Regarding:   Quarles vs. Commissioner Outlaw
 4  Reporter:    Weems/Tate
 5  _____
 6
 7  I declare under penalty of perjury the following to
 8  be true:
 9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2022.
16
17
18
19
20
21
22
23
24          Signature_____
25              Ofc. Matthew Ponente
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

**1**

**10.2** 25:11

**10:06** 5:5

**10:44** 39:9
39:12

**10-point**
24:12

**18** 24:13

**2**

**20** 37:22

**2000-either**
24:13

**2015** 25:12

**2017** 11:15

**2018** 11:15

**2020** 24:8
24:17

**2021** 25:13

**2022** 5:4

**3**

**30** 32:25 33:1
37:23

**4**

**4** 5:4

**9**

**911** 8:15 8:16
8:20 8:21
8:23 8:24
9:1 9:11
9:19 10:1
14:13 14:18
16:6

**95** 38:4

**A**

**a.m** 5:5
39:9 39:12

**Aaron** 5:19

**abilities**
37:2 37:4

**ability** 12:19
18:17

**able** 7:21
10:15 10:22
13:16 14:21
17:14 17:15
22:4
26:14 26:19
31:4
34:12 34:22

**accepted** 33:5

**access** 15:2
17:1 17:8
33:19 34:4

**according** 7:4
11:8 24:3
27:16 31:6

**activate**
6:7 18:16

**actually** 18:6

**added** 19:12

**admonished**
29:12

**advice** 29:16

**affirm** 5:12

**ago** 11:6
15:17

**ahead** 15:15
20:5
20:22 23:24

32:23 33:13

**alluding**
18:24 19:10
19:16
20:8
21:16 21:18

**already** 35:25

**am** 7:22

**animus** 36:12

**answer** 9:21
11:20
12:1
12:18 15:15
16:19 20:14
23:24
31:1
31:14
36:2 37:1

**answered**
32:22 33:12
35:24

**anyone**
16:23 26:18
29:15 29:15

**anything**
11:16
18:2
21:10 21:24
36:4

**apply** 19:5

**aren't** 31:4

**arise** 27:10

**arm** 27:9

**armed** 21:10
21:11 21:14

**arrest** 12:6
13:3
16:12 17:16

19:3
23:17
24:7 25:1
32:17

**arrested**
29:25 36:23
37:6 37:10

**arresting**
12:10

**arrests** 17:15
32:19 37:23
38:1

**assume**
18:15 21:13
28:18

**attack**
15:11 19:24

**attempt**
10:1 21:2
21:25

**attempted**
15:7 15:8
30:20
33:3 33:8

**audio** 18:17

**average** 32:20
37:23

**aware** 7:13
7:14 18:5
26:10 29:22
30:4 30:8
30:12 30:12
30:16 31:10

**away** 20:20

**B**

**basically** 9:1
12:14 22:19
23:6 34:9



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

36:8

**behalf** 5:21

**behind**
  20:16 21:19

**believe** 12:11
  13:4 21:9
  22:14 28:14
  36:5 36:8
  36:22 37:9

**Bell** 5:19
  5:19 6:4
  9:24
  11:22
  12:5
  12:22 15:20
  16:21
  20:9
  20:18 20:25
  24:1 24:5
  24:9
  24:19
  25:9
  25:17 25:19
  30:1 30:3
  31:3
  31:16
  33:2
  33:16 33:22
  33:25
  35:6
  35:11 35:18
  36:1 37:1
  37:3
  37:15 38:11
  38:14 38:22
  38:24

**Bentley** 22:10

**best** 8:17
  9:13 9:17
  10:16 12:18
  30:19

37:1 37:4

**better** 7:10
  8:14

**black** 36:9
  36:12

**body** 10:9
  10:12
  14:6 14:8
  14:10 14:21
  15:6
  15:22 15:22
  17:18 17:19
  17:20 17:24
  18:3 18:9
  18:15 18:16
  26:5
  26:22 27:17
  27:20 28:16

**bodycam** 28:9

**Boys** 36:15

**briefly** 7:15

**bunch** 6:12

---
C
---

**cam** 10:9
  10:12
  14:7 14:8
  15:6
  15:22 15:22
  17:18 17:20
  18:9
  18:16
  26:5
  27:17 27:20
  28:16

**camera**
  14:10 14:21
  17:19 17:24
  18:3 26:22

**car** 21:9
  21:22
  22:1 22:6
  22:9
  22:12 22:18
  23:2 23:3
  23:3 37:13

**carry** 10:20
  16:8 27:1
  30:21 31:24
  32:2 32:5
  32:10

**case** 10:22
  10:25
  11:5 11:9
  16:13 23:17
  25:21 27:12
  29:10 36:19

**caught** 20:17

**cause** 12:15
  12:25
  13:4 27:5

**caused** 36:5

**CDI** 8:4 14:23

**cell** 15:8
  34:18

**center** 7:20
  8:1 8:1
  8:10 9:18
  9:22 10:3
  13:8
  13:17 33:14
  33:15 34:21
  34:23
  35:2 35:5
  35:5 35:7
  35:10

**centers**
  7:16 7:17

7:21 8:8
11:10 26:14
35:6

**certainly**
  34:1

**certified** 9:6

**changed** 24:16
  24:16

**charge** 19:11

**charges** 19:5

**charging**
  19:14

**chase** 18:25

**check** 13:24
  26:20

**clarification**
  25:10

**clear** 8:20
  11:7
  14:18
  25:8 30:1
  34:15

**clearer** 7:10

**client**
  17:13 21:19
  27:13

**colleagues**
  16:16 23:16

**color** 22:6

**Commissioner**
  5:22

**committed**
  12:12

**communication
s** 29:5 29:6

**completed**



compliant
20:2 20:6
20:8

complied 21:2

comply 20:10

computer 7:23

concerned
8:24

concerning
7:6 7:12
24:22 35:3

concluded
39:12

conclusion
12:17

conduct 29:10

connected
13:20

considered
20:8 24:3
25:14

consistent
33:4

contact
14:3 22:18

contacted
14:13

contacting
14:15

contest 15:25

contesting
27:21

copy 25:16
39:1

correct 7:8

7:17 7:18
8:2 8:3 8:6
9:4 9:8
9:12
10:24
12:8 12:9
12:13 12:21
12:25
13:6
13:18
19:2
19:17
21:7 25:1
27:4
27:22 30:22
31:2 31:9
32:3 32:7
34:22 34:23
36:3 36:10

correctly
26:21

could've 28:2
28:3

counsel
5:17 5:24
35:13 38:16

County
13:20 14:13
14:23 14:25
16:5 16:5

County's
14:15

couple 13:7
32:11

courtesy
36:18

courthouse
14:3 14:4
30:14

crazy 34:5

crime 12:7
12:12
13:4
18:21 19:1

criminal 7:25
8:5

current 24:6

currently
29:21 29:21

custody
12:8 19:7
19:9
19:15 20:24

cut 32:23

_____

D

damage
22:13 22:14
23:13 23:15

dangerous
21:10 21:12
21:14
22:7
23:19 23:20

database
13:24

date 25:11
25:12

DBI 13:9
13:17 13:22

dead 20:17
20:20

deal 29:16

December
25:12

decided 19:15

Defendants
5:22

deliberately
15:10 15:11

denied 17:22

Department
7:5 7:12
24:4
27:25 33:6

department's
8:5

depicted 14:8

DEPONENT 5:10
5:15 9:22
11:21
12:2
12:20 15:16
16:20
20:6
20:15 20:23
23:25 24:15
31:2
31:15 32:25
33:14 33:23
35:9
37:17 38:13

deposition
5:1 39:11

describe
21:17

desk 27:24
27:25
28:3 28:4
28:5 28:7
28:10 28:15
28:18 28:20
28:21 28:25
29:1 29:2
29:4



**Detective**
17:4  17:6
17:11  17:12
17:14  17:22
18:4

**determine**
31:23

**different**
13:12  28:6

**directive**
24:20  25:11

**directives**
24:4  24:6
24:6
24:10
25:2  25:3
25:4

**disagree** 14:7
26:4

**disciplined**
29:9

**discussion**
14:14
17:4  17:18

**dispatch** 8:15
8:16  8:21
8:24  9:19
13:20  14:16
14:17  14:18
15:1  28:6

**dispatcher**
8:23

**dispute** 10:11
10:13  14:11

**disputing**
15:22

**disregarded**
21:23

**disregarding**
19:19  19:21
21:5

**division** 8:5

**done** 5:9  5:10

**dozens** 32:16

**draw** 19:22

**drawing**
24:2
24:22  25:20

**drive** 37:13

**duly** 6:1

**during** 13:14

———————
E
**education**
6:14

**effective**
25:11

**either**
10:23  11:13
11:15  16:22

**electronic**
39:3

**else** 16:24

**emergencies**
9:3

**encounter**
11:4  22:7
23:20  31:21

**encountered**
10:19
30:6  30:18

**encountering**
10:18  25:23

**enforcement**

9:10
16:25
17:7
18:21  26:11
33:18  33:19
34:1  34:2
34:3
34:10  34:11
35:7  35:10

**essentially**
12:15

**E-tran** 39:7

**evade** 21:25

**everybody**
35:14  35:14

**everybody's**
35:15

**evidence** 21:9

**exact** 32:15

**exactly**
12:3  28:1

**EXAMINATION**
6:3  37:20

**examined** 6:2

**expecting**
32:14

**experience**
33:17

**explain**
6:19  6:24
7:19  21:17

**extent** 34:7

**eye** 12:3

———————
F
**fact** 32:5

**fair** 30:17

**fake** 10:6
10:13  10:13
10:17

**faked** 10:5

**fall** 24:17

**false** 18:20
19:4  19:7

**February** 24:7
29:25

**fellow** 16:12

**fight** 21:2

**filled** 25:15

**finally** 13:15

**fire** 27:9

**firearm**
10:5
13:24
24:2
25:14  25:20
25:25
26:7
26:15  26:18
26:23  26:25
27:7  27:9
31:18  31:23

**firearms**
26:12

**Five** 6:18

**fled** 25:22
27:13  27:17

**flee** 21:20

**fleeing** 18:24
19:10  19:16
20:8
21:15  21:18

**Floyd** 24:17

**follow-up**

38:12 38:14

**force** 24:3
24:22 24:23
24:25
25:5
25:13 25:15

**form** 9:20
11:19 11:25
16:18
20:4
20:13 20:21
23:23 25:15
29:24 30:25
31:13

**fought** 20:11

**friend's**
26:23 26:25

**front** 22:19
24:13 27:24
27:25
28:3 28:4
28:5 28:7
28:10 28:15
28:17 28:20
28:21 28:25
29:1 29:2
29:4

**furnishing**
19:4

**fusion** 7:17
7:20 7:21
8:1 8:10
9:18 9:22
10:3
11:10
13:8
13:16 16:24
17:7
26:13 33:14
33:15 34:21

34:23
35:2 35:5
35:5 35:6
35:7 35:10

———————
G
**GBI** 16:24

**general**
8:10 9:10

**generally** 8:4
33:5 35:6
35:7 38:8
38:9

**George** 24:17

**Georgia** 7:1
7:6 7:13
8:9 10:19
11:4 12:3
13:8 13:9
13:16
16:6
16:16
17:7 17:8
17:14 17:16
17:22 27:24
29:16 30:16
31:5 31:6

**Georgia's**
30:13
31:5
35:21 35:25

**given** 32:8
32:13

**giving**
18:20 19:7

**great** 39:6

**guess** 9:10
12:20 20:19
22:19 23:19

26:6 28:1
28:5

**gun** 6:20 6:21
6:25 10:1
11:4
11:17
15:2
15:23 16:17
17:1 17:8
29:22
30:5
30:14
31:5 31:5
32:17 32:19
33:4 33:9
33:10 33:19
34:4
34:11 34:13
34:17 34:22
35:3
35:20 37:23
37:25
38:2 38:2

**Gwinnett**
13:20 14:13
14:15 14:23
14:25
16:4 16:5

———————
H
**hand** 5:8

**handcuffs**
37:12

**happen** 11:2
11:3 26:9

**happened** 13:4
15:16 26:1

**hard** 22:25

**haven't** 10:15

**having** 6:1

15:12

**heard** 35:19

**he's** 23:21

**Hey** 6:7

**high** 6:15
18:25 21:20

**highest** 6:14

**Hmm** 23:5

**Hold** 18:14

**hotline** 9:1
10:2

———————
I
**ID** 19:4 19:7

**idea** 37:8
37:11

**Ignore** 25:7

**I'll** 6:10
8:13 9:20
11:19 38:5

**I'm** 6:10 6:11
7:14 8:12
8:24 9:13
12:2 13:4
18:7
19:11 19:11
19:13 21:15
26:19 28:16
30:8
30:16 32:14
34:15 34:20
35:15 36:16

**immediately**
25:4 25:5

**impact** 22:25

**implemented**
24:18

important
  31:18

incident
  20:24
  21:1 29:19

includes
  25:13

individual
  9:23
  15:17 21:11

individuals
  21:13

information
  7:16 7:22
  8:8 9:16
  9:17 17:9
  18:21
  35:2 35:3

informed
  13:23

initial 23:19

initially
  20:16

intake 8:25

intelligence
  8:1 8:5

invalid 10:23
  36:5 38:2

investigating
  9:17

investigation
  13:14

isn't 34:16
  34:16

I've 5:10
  15:7 37:6
  37:6 39:7

J
jail 30:24
  32:2 32:6

JANUARY 5:4

job 31:19

Jordan 35:17

judge 30:14
  35:22

K
knocked 22:20
  22:21
  23:9 23:10

knowledge
  8:17 9:13
  10:16 19:23
  24:11 30:19

L
lane 23:2

last 15:9

law 9:10
  16:25
  17:7
  18:21 26:11
  26:17 33:18
  33:18
  34:1 34:2
  34:3 34:9
  34:10
  35:7 35:10

lawfully
  31:22

laws 30:13
  30:16 35:25

least 15:1

legal 12:16

26:25

legit 11:23

legitimate
  12:4 32:5

let's 8:15
  18:15

level 6:14

license
  6:20 6:21
  6:25 7:3
  7:7 10:1
  10:5
  10:13 10:17
  10:19
  11:5 11:8
  11:17 13:24
  16:17
  27:1
  29:22
  30:5
  30:15 30:20
  31:24
  32:1 32:5
  32:10
  33:4 33:9
  33:10 34:22
  36:5 36:8

licenses
  31:18

light 23:2

lights 21:24

little 7:9

local 8:4

locate 22:4

located 29:7

long 6:16

M

male 13:17

man 30:24

manner 33:3

MATTHEW 5:2
  6:1 39:12

may 5:25
  26:22

maybe 37:11
  37:12

mean 8:19
  12:2
  18:10 19:14
  23:1
  32:23
  34:7 35:4

meaning 21:1

means 16:2

member 36:14

members 9:2

memo 24:25

mentioned
  7:15 37:22

mini 39:7

minis 39:3

minivan 22:9

mirror
  22:20 22:21
  23:8 23:10

mislead 16:11
  16:15 16:20

moment 15:5
  31:4

morning 6:5
  6:6

multiple

15:24

_____

**N**

**naked** 12:3

**NCIC** 7:16

**NCIC/PCIC**
  6:22 7:3

**necessary**
  25:21

**night** 15:9

**nobody** 31:7

**none** 32:12

**Normally** 6:22

**note** 39:8

**nothing**
  5:14 16:8

**nothing's**
  18:12

**notice** 22:13

_____

**O**

**object** 9:20
  11:19
  14:7
  20:13 23:23

**Objection**
  11:25 12:16
  15:14 16:18
  20:4
  20:21 29:24
  30:25 31:13
  32:22 33:12
  35:4
  35:24 36:24

**occasional**
  38:6 38:7

**occasions**

15:2

**offense** 21:6

**officer** 5:2
  5:7 5:22
  5:23 6:5
  6:7 6:17
  8:21 9:5
  9:6 9:19
  9:21
  11:20
  12:1
  12:18 12:23
  12:24 13:10
  13:22
  14:9
  14:17 14:18
  15:1
  15:15 16:19
  16:22 16:25
  17:3 17:7
  18:21 20:14
  20:22 23:24
  25:21
  30:4
  30:13
  31:1 31:4
  31:14 33:13
  33:18
  34:2
  34:17 35:19
  37:4
  37:16 37:18
  39:11

**officers** 8:16
  16:12 18:25
  19:10 19:16
  34:3 34:17

**officials**
  16:16 33:19

**Oh** 18:5 21:13

**okay** 6:16

6:19 6:24
7:4 7:24
8:7 10:18
10:22
11:7
11:11 11:16
11:16
12:6 13:6
13:15 14:17
14:25
15:5
15:10 15:21
16:1 16:2
16:22
17:3 17:3
17:6
17:20
18:8
18:13 18:20
19:6
19:20 20:10
21:1
24:20 24:25
25:3
25:18 25:24
26:10 27:19
28:11 28:13
28:20
29:1
32:13 32:25
34:9
34:14 36:21
37:25
38:7
38:10 38:13
38:15 38:16
39:7

**oncoming**
  21:21

**ones** 25:4
  25:5 38:7

**operator** 9:11

14:13 15:23
  16:5 16:6

**opinion** 34:25
  34:25

**opportunity**
  10:8

**original**
  38:22

**otherwise**
  21:12

**Outlaw** 5:22

**owner** 26:8
  26:15 26:20

**ownership**
  26:12

_____

**P**

**paint** 23:13

**Pardon** 24:5

**parked** 23:3
  23:4

**particular**
  27:9

**passenger**
  22:16 22:17

**PCI/NCIC** 16:7

**PCIC** 7:16
  7:25

**peace** 9:6

**penalty** 5:12

**Pennsylvania**
  6:20 6:22
  7:3 7:7 9:7
  9:25
  26:10 33:15
  35:5 38:2
  38:3 38:9

Pennsylvania's 7:25

people
 13:12 36:12
 38:1

per 12:3

percent 38:4

percentage
 37:25

Perfect 5:16

perfectly
 11:23

perjury 5:12

permit 15:2
 15:24
 16:7 17:1
 17:8
 17:13 17:23
 29:17
 31:5
 33:20
 34:4
 34:11 34:13
 34:18
 35:3
 35:20 38:6

permits 7:6
 7:13 12:3
 38:2 38:3
 38:5 38:8

person 12:7
 12:11 13:19
 15:17 31:24
 32:1 32:5
 36:22 36:25
 37:9

personal
 15:11

person's 32:4

Philadelphia
 7:5 7:12
 24:4
 27:24 33:6

phone 15:8
 31:12 34:18

pictures 22:1

pinpoint
 11:12

pistol
 19:22 24:22

please 5:8
 5:17
 25:17 38:24

point 6:11
 16:11 16:15
 18:12 19:21
 26:21 26:23

pointed 25:14

pointing
 23:15

police 6:16
 7:5 7:12
 8:5 9:5
 12:6 12:7
 16:6
 18:24 21:25
 24:4
 27:14 27:18
 27:25
 33:6
 34:17 35:1

policy 7:11
 24:4

Ponente 5:2
 5:7 5:22
 6:1 6:5

25:21
 30:4 39:12

position
 15:18

practices
 33:5

pretty 9:3

prior 10:18
 11:5
 12:10 17:15
 17:16
 25:4 25:5

probable
 12:15 12:25
 13:3

probably
 32:14

procedure
 11:9 31:6
 31:11 35:20
 35:20

proceed 5:25

proceeded
 21:20

process
 6:19 6:21
 19:14

processed
 12:8

prohibits
 26:11

Proud 36:15

proven
 21:12 21:12

provided
 7:5 33:6

public 9:2

27:1 31:22

pulled
 20:11 20:15

purpose 34:12

_____
Q
_____

qualifications 9:11

Quarles
 5:20 10:4
 10:18
 11:5
 11:17 17:22
 19:3
 19:18 19:20
 21:8
 22:23 25:25
 26:6
 29:22
 30:5
 30:18
 31:5 33:4
 33:9 36:4
 36:17

quarters 23:5

question 7:11
 8:14
 12:24 30:12
 33:21 33:22
 33:24
 34:6
 34:16 37:19

questions
 6:10 6:13
 13:7 38:11

quick 37:18

_____
R
_____

race 36:4

racial 36:11

radio 28:2
  28:5 28:7
  28:22 28:23
  28:24 29:5

railroad
  30:23

raise 5:8

ran 16:6
  25:24 26:7

rank 9:15

rat 20:19

rate 21:20

Razman 5:23
  16:23

reach 13:16

ready 38:18

really 34:5

reason
  12:11 12:14

reasonable
  36:22 36:25
  37:9

recall
  10:17
  13:9
  13:11
  14:1 14:2
  14:5
  14:20 14:24
  14:25
  15:4
  15:13 15:17
  16:4 16:9
  16:10
  17:2 17:3
  18:2 18:3
  22:8

22:11 22:22
22:24 23:10
23:15 23:18
26:2
26:20 27:19
28:1 28:3

received 8:25

recollection
  15:12

record 5:17
  38:19 38:22
  39:10

recorded
  17:18 17:19
  18:6 18:15

recording
  18:12

records
  15:3
  15:24
  17:1 17:8
  33:20
  34:4
  34:11 34:18

red 21:24
  23:2

refers 7:25
  28:4

register
  26:18

registered
  25:25
  26:7 26:14

registration
  26:11

registry
  26:11

remember

10:25 14:14
14:15
17:9
17:10 17:12

remind 35:14

REMOTE 5:1

repeat 33:23

rephrase 6:10

report 9:2

REPORTER
  5:7 5:11
  5:16 5:24
  35:13 38:16
  38:18 38:21
  38:25
  39:4 39:7

represent
  5:18 5:19

require 30:13

required
  31:23

responsibilit
  ies 8:16
  8:18 8:22

review 10:9
  10:15 14:21
  15:6 15:7
  15:8 26:22

revoked
  38:6 38:8

ridiculous
  6:12

riots 24:17

road 21:22
  21:23 21:24

robbery 17:16

room 28:2

28:5 28:7
28:22 28:24
28:24

Rose 17:4
  17:6
  17:11 17:12
  17:14 17:22
  18:4

roughly 37:22

run 7:21 27:7

running 23:21

Ryan 5:19

_____
      S

saw 17:16

scene 16:12
  16:23 16:24
  23:16 27:16

school 6:15

se 12:3

second 18:14

send 25:15
  27:25

sent 27:23
  28:2 28:8
  28:18

sergeant
  16:23 27:15

serious 12:7

several
  11:6
  11:11 13:11

Shannon 5:21

showed 26:5

shows 10:12
  15:22 17:21
  17:21 17:24



27:20

**sideswiped**
21:22
22:2 22:6
22:12 23:3

**sideswiping**
23:21

**sign** 19:19
19:21 21:5

**signs** 21:23

**similar** 35:21

**simple** 34:5

**simply** 15:12

**single** 27:7
27:8

**solemnly** 5:11

**somebody**
34:12 36:21
37:7

**someone**
12:6
12:10
13:3 16:7
25:22 31:21
32:9

**someone's**
34:17

**sorry** 8:12
9:13
18:13
25:9 30:2
32:23 35:17

**sound** 18:8
18:10

**sounds** 34:5

**source** 9:17

**sources** 9:16

**speak** 35:14

**specific** 7:11
31:6

**specifically**
11:14 17:10

**speed** 18:25
21:20

**spoke** 14:17
15:17 18:4

**state** 5:17
7:1 9:7
26:17

**stated**
26:21 26:22

**status** 16:8

**stop** 19:18
19:19 19:21
21:5
21:23 31:22

**stopped** 19:20
20:17 25:22

**straight** 38:5

**street** 27:3
31:22

**strike** 25:6

**subject** 9:18

**summer** 24:16

**supervisor**
28:10 28:17
29:4

**supervisors**
29:13

**sure** 19:11
31:15

**surprised**

23:12 23:14

**surrendered**
21:2

**suspicion**
27:10

**suspicious**
26:3 26:6
27:6
27:12 27:18

**swear** 5:11

**switch** 18:17

**sworn** 6:1 9:5
9:5

**system** 6:23
7:3 16:7

---

T

**taking** 35:15

**talk** 8:7 8:15
14:22

**talked**
13:17 27:15

**talking**
13:9
13:11
24:6
25:10 28:10
28:16 28:17
30:9

**taught** 31:7
33:10

**teletype**
27:23 27:25
28:8 28:19

**testified** 6:2

**testimony**
5:13

**thank** 5:16
5:24 6:9
35:15 37:16
37:17 38:20
39:6

**there's** 8:9
13:23 23:12
25:12
28:6 35:9

**they're**
7:21
21:11 36:22
37:9

**tight** 23:5

**til** 21:12

**totally** 26:25

**towards** 22:19
36:12 36:12

**traffic** 21:21

**trained**
6:25 12:2
12:24

**training**
7:4 9:10
30:19
33:5 33:18

**transcript**
38:23

**trapped** 20:19

**treat** 21:11
36:18

**trick** 12:23
30:11 34:6

**tried** 23:1

**truth** 5:13
5:14 5:14

**trying**

30:23 31:12

**turn** 18:8
 18:9 18:10

**Twenty**
 32:21 32:25

**typically**
 33:19
 34:3
 34:11 34:21

—————————
U
—————————
**unable** 15:8

**understand**
 6:9 20:7
 26:17 26:19
 34:3 34:10

**understanding**
 34:2
 34:21 35:8

**unknown** 22:18

**unless** 13:3

**unusual** 11:17
 34:24 34:25

**updated** 24:10
 25:12

—————————
V
—————————
**valid** 10:23
 11:8
 17:13 17:23
 29:22 29:24
 30:5
 30:21
 32:9 36:9

**validity** 10:7

**vehicle**
 22:4
 22:13 22:18

22:18 23:13
23:16

**vehicles**
 23:21

**verification**
 35:20

**verified** 11:7

**verify** 6:25
 7:6 7:7
 10:1 10:7
 10:23 16:17
 30:14 30:20
 31:5
 31:12
 32:4 32:9
 33:4 33:8
 33:10 34:12
 34:22

**verifying**
 6:20 6:21
 31:18

**video** 6:7

**VIDEOCONFEREN
CE** 5:1

**violent** 21:6

**voices** 35:15

**volume** 18:17

—————————
W
—————————
**warned** 29:12

**warrants**
 24:23

**wasn't**
 19:16 28:22

**waste** 6:12

**wedge** 23:1

**week** 32:8

**WHEREUPON**
 39:11

**whether**
 11:8
 30:20 31:24
 32:9
 34:12 34:16

**white** 36:17

**whole** 5:14
 29:23

**whom** 5:18

**would've** 33:9

**wrong** 21:21
 21:21 21:22

—————————
Y
—————————
**you've** 5:9
 28:25

—————————
Z
—————————
**Zabel** 5:21
 5:21 9:20
 11:19 11:25
 12:16 15:14
 16:18
 20:4
 20:13 20:21
 23:23
 24:5
 24:10
 25:9
 25:18 29:24
 30:25 31:13
 32:22 33:12
 33:21
 35:4
 35:17 35:24
 36:24 37:18
 37:21 38:10
 38:15 38:17

38:20 38:25
39:2 39:5

