# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QUARLES | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 21-02813** |
| | : | |
| PONENTE, et al. | : | |
| *Defendants* | : | |

## MEMORANDUM

**Kenney, J.**                                                                      **May 2, 2022**

## I.      BACKGROUND

Plaintiff Ryan Quarles has been a Georgia resident since 2015. ECF No. 47-2 ¶ 1. He travels from Georgia to Philadelphia regularly to visit family. *Id.* On February 3, 2020, Defendants, Officer Matthew Ponente and Officer Gina Rozman, stopped Plaintiff in the area near 21st Street and Nedro Avenue in Philadelphia. ECF No. 46-2 ¶¶ 1–5; ECF No. 47-2 ¶ 10. Plaintiff stated that he was unaware of any basis the police might have had to pull him over, but nonetheless complied with Defendants' signals. ECF No. 47-2 ¶ 10. Defendants state that Plaintiff "disregard[ed] a stop sign and fail[ed] to signal while making a right turn," and as soon as Plaintiff saw their marked police car, "fled at a high rate of speed." ECF No. 46-2 ¶¶ 2–3. Defendants stopped Plaintiff and conducted a search, finding a .38 Special snub-nose revolver in Plaintiff's pocket. *Id.* ¶ 8; ECF No. 47-2 ¶ 11. Defendants also found Plaintiff's License to Carry ("LTC") issued out of Gwinnet County, Georgia.[1] ECF No. 46-2 ¶¶ 11–13; ECF No. 47-2 ¶ 11.

---

[1] Plaintiff's Georgia LTC has been verified by Judge Christopher A. Ballar of the Gwinnett County Probate Court. ECF No. 47-5 at p. 2. According to Judge Ballar, Plaintiff's license was valid from September 29, 2016, through July 28, 2020. *Id.* Moreover, Judge Ballar cites O.C.G.A. § 16-11-129(I), which allows the judge of a probate court to "verify the legitimacy and validity of a weapons carry license of a license holder pursuant to a subpoena or court order, for public safety purposes to law enforcement agencies … ." *Id.*

Defendants handcuffed Plaintiff and detained him in their police car while Defendant Ponente made calls attempting to verify the validity of Plaintiff's Georgia LTC. *See* ECF No. 46-5 (Exhibit C); ECF No. 47-2 ¶¶ 11–12. Defendant Ponente initially contacted the Pennsylvania Fusion Center, which told him that Plaintiff did not have a valid LTC from Pennsylvania or any firearms registered in Pennsylvania. ECF No. 46-2 ¶ 14. The Pennsylvania Fusion Center directed Defendant Ponente to call the Georgia Fusion Center, which subsequently informed Defendant Ponente that Georgia does not have a database of permit records, and verification of a permit required contact with the local courthouse. ECF No. 47-2 ¶ 13; ECF No. 46-2 ¶ 17. The Georgia Fusion Center agent recommended that Defendant Ponente call the Gwinnett County police department and speak to someone from the Criminal Investigation Division ("CID") who might be able to connect him to a resource that could verify the gun permit. ECF No. 46-2 ¶ 18; ECF No. 47-2 ¶ 14. Defendant Ponente called the Gwinnet County police department and was connected to an emergency hotline operator, who told him that the CID office was closed and that he should send a teletype with Plaintiff's information, given that dispatch "[doesn't] have those kinds of records." ECF No. 46-2 ¶¶ 23, 25; ECF No. 47-2 ¶ 15. After sending the teletype, Defendant Ponente was told that "nothing came back" regarding Mr. Quarles Georgia LTC. ECF No. 47-2 ¶ 18; ECF No. 46-2 ¶ 26; ECF No. 46-5 at 33:46. Subsequently, Defendant Ponente called Detective Shane Rose and told him that "there is no permit to carry information for this male" and that the Georgia Fusion Center "denied" that Plaintiff had a permit to carry. ECF No. 46-5 at 36:13, 36:40; ECF No. 47-2 ¶ 22. Following the conversation with Detective Rose, Defendant Ponente told his colleagues that Plaintiff was "catching a VUFA"[2] and brought him to the station. ECF No. 46-5 at 37:20; ECF No. 46-2 ¶ 29.

---

[2] It is inferred that "VUFA" refers to a "Violation of the Uniform Firearms Act."

Plaintiff was detained for approximately one month in jail prior to his release on bail. ECF No. 1-1 ¶ 23. The District Attorney's Office charged Plaintiff for carrying a firearm without a license, pursuant to 18 Pa. Cons. Stat. §§ 6106, 6108. *Id.* ¶ 20.

In a separate incident, Plaintiff was arrested on March 28, 2020, for possession of a firearm without a license and possession of a stolen firearm. ECF No. 47-2 ¶ 32; ECF No. 46-2 ¶ 30. Plaintiff, at that time, did not have his physical license to present to officers upon request. The arresting officers and corresponding detectives could not verify the validity of Plaintiff's Georgia LTC. ECF No. 47-2 ¶¶ 32, 33. As a result, Plaintiff served approximately six months in jail prior to release on bail. ECF No. 1-1 ¶ 35. The District Attorney's Office charged Plaintiff for carrying a firearm without a license pursuant to 18 Pa. Cons. Stat. §§ 3925, 6106, 6108. *Id.* ¶ 33.

On May 4, 2021, the State of Georgia notified the District Attorney's Office that Plaintiff's LTC was valid, and on May 20, 2021, all charges against Plaintiff—from both the first and second arrests—were dismissed. *Id.* ¶¶ 21–22, 34. After charges were dismissed, PPD kept Plaintiff's LTC and firearm from the February 3, 2020 arrest. ECF No. 16 ¶ 33.

Commissioner Outlaw admits that a Reciprocity Agreement[3] between Pennsylvania and Georgia exists in which "each state agrees to honor the other's licenses to carry firearms" issued to respective residents 21 years or older. ECF No. 47-2 ¶¶ 2, 5. PPD Officers are trained according to PPD Directive 5.27, which requires them to "run[] the individual's information

---

[3] In response to Plaintiff's Request for Admissions, Defendant Commission Outlaw objected to Plaintiff's question—"You are aware that Pennsylvania and Georgia have a gun permit reciprocity agreement"—on the ground that "[o]fficial capacities suits are simply another way of pleading an action against an entity of which an officer is an agent" and because the City is not a person, it cannot be "aware." ECF No. 47-6 ¶ 3. However, "[s]ubject to, and without waiving said objection," Commissioner Outlaw "admitted that a reciprocity agreement exists between the State of Georgia and the Commonwealth of Pennsylvania." *Id.* In Exhibit B, Plaintiff provides the Reciprocity Agreement between Georgia and Pennsylvania, which states that Pennsylvania "shall recognize all valid GA Licenses issued to residents of the State of Georgia who are 21 years or age or older … ." ECF No. 47-4 at p. 3.

through the [Pennsylvania Fusion Center] system." *Id.* ¶ 40; ECF No. 46-13. Directive 5.27 does not specify whether verification of out-of-state LTCs requires a different process.[4] *See* ECF No. 46-13; ECF No. 47-8 at p. 4 (deposition of Defendant Ponente wherein he states that officers are trained to verify Georgia LTCs with the same process they use to verify Pennsylvania gun permits); ECF No. 47-9 at p. 7, ¶¶ 6–11 (deposition of Officer Tilghman wherein he states that PPD does not have a specific policy for verifying Georgia LTCs).

After being cleared of all criminal charges, Plaintiff brought a civil action in state court on May 25, 2021, against Officers Matthew Ponente, Gina Rozman, Aaron Turner, Kevin Tilghman, and Sergeant McCabe (whose first name was unknown) in their official capacities. *See* ECF No. 1-1 at p. 2, ¶ 1. The case was removed to this Court on June 24, 2021. ECF No. 1. On November 22, 2021, Plaintiff submitted an Amended Complaint, and Officers Turner and Tilghman were terminated from the case. ECF No. 16. Plaintiff alleges nine counts against Defendants Ponente and Rozman: False Arrest (Count 1) (pertaining to February 3 arrest), Illegal Stop (Count 2), Illegal Search (Count 3), Malicious Prosecution (Count 4) (pertaining to February 3 arrest), Civil Conspiracy (Count 5), Conversion (Count 6), False Arrest (Count 7) (pertaining to the March 28 arrest), Malicious Prosecution (Count 8) (pertaining to the March 28 arrest), and Intentional and/or Negligent Infliction of Emotional Distress (Count 9). *Id.* ¶¶ 56–67. Plaintiff alleges three *Monell* claims against Defendant Outlaw, including Due Process – Failure to Train and Supervise (Count 10), and Due Process – Enforcement of Unlawful Custom and Pattern (Counts 11 and 12).[5] *Id.* ¶¶ 68–75.

---

[4] Verification of a Georgia LTC requires contact with "the specific probate court from where the permit was issued." ECF No. 47-2 ¶ 4 (citing O.C.G.A. §§ 16-11-129(1), 50-18-72(a)40)).
[5] Counts 10–12, which allege that Defendant Outlaw, in her official capacity, violated 42 U.S.C. § 1983, are hereinafter referred to as "*Monell* claims."

On December 8, 2021, Defendant Outlaw filed a Motion to Dismiss Plaintiff's *Monell* claims for failure to state a claim. ECF No. 25. On December 20, 2021, this Court denied Defendant Outlaw's motion without prejudice, on the basis that the factual deficiencies alleged in Defendant Outlaw's motion "are not required to be plead by the Plaintiff with specificity at the motion to dismiss stage." ECF No. 29 at p. 1, n.1.

On March 1, 2022, Defendants Ponente, Rozman, and Outlaw filed a partial Motion for Summary Judgment that seeks to have False Arrest (Count 1) (pertaining to February 3 arrest), Malicious Prosecution (Count 4) (pertaining to February 3 arrest), Civil Conspiracy (Count 5), False Arrest (Count 7) (pertaining to March 28 arrest), Malicious Prosecution (Count 8) (pertaining to March 28 arrest), Negligent Infliction of Emotional Distress (Count 9), Due Process – Failure to Train and Supervise (Count 10 - *Monell*), and Due Process – Enforcement of Unlawful Custom and Pattern (Counts 11 and 12 - *Monell*) dismissed with prejudice. ECF No. 46. This partial Motion for Summary Judgment is now before the Court.

## II.     LEGAL STANDARD

Summary judgment is granted where the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there must be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that "might affect the outcome of the suit under governing law[.]" *Id.* at 248.

When deciding a summary judgment motion, the Court considers the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving

party's favor. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). The judge's role is not to weigh the disputed evidence and determine the truth of the matter, or to make credibility determinations; rather the court must determine whether there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 249. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, in a case where the non-moving party is the plaintiff—who bears the burden of proof—the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

Ultimately, the question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

### III.    DISCUSSION

### I.    False Arrest (Counts 1 and 7)

Plaintiff brings two claims of false arrest for separate incidents on February 3, 2020 (Count 1) and March 28, 2020 (Count 7). Defendant moves for summary judgment on both claims. An "arrest without probable cause is a constitutional violation" and gives rise to a cause of action for false arrest under 42 U.S.C. § 1983. *Noble v. City of Camden*, 112 F. Supp. 3d 208, 230 (D.N.J. 2015) (internal citation and marks omitted). "The Third Circuit has held that courts must apply a 'common sense approach,' based on the totality of the circumstances, to determine whether there was probable cause to arrest." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 230 (D.N.J. 2015) (quoting *Paff v. Kaltenbach,* 204 F.3d 425, 436 (3d Cir.2000)). "Whether probable

cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Jackson v. City of Philadelphia*, 2020 WL 7181056, at *5 (E.D. Pa. Dec. 7, 2020) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). In addition, officers may be protected from liability due to qualified immunity "if a reasonable officer could have believed that probable cause existed" to arrest plaintiff "in light of clearly established law and the information the [arresting] officers possessed." *Hunter v. Bryant,* 502 U.S. 224, 228–29 (1991); *Anderson,* 483 U.S. at 641; *Blaylock v. City of Philadelphia,* 504 F.3d 405, 411 (3d Cir. 2007).

Viewing the evidence in the light most favorable to the non-moving party, genuine issues of material fact remain as to whether the officers had probable cause to arrest Mr. Quarles, precluding summary judgment on Plaintiff's §1983 Fourth Amendment claim for false arrest on February 3, 2020, and as to officers' claim that they are entitled to qualified immunity, but such issues of fact do not exist for false arrest on March 28, 2020.

### 1. February 3, 2020 (Count 1)

Defendants claim that the Court should grant summary judgment on Count 1 for False Arrest because probable cause existed to arrest Plaintiff and the officers cannot be held liable due to qualified immunity. Defendants allege that Officers Ponente and Rozman attempted to stop Plaintiff for a traffic violation when he fled from them in his car at a high rate of speed. ECF No. 46 at 7. Plaintiff then allegedly attempted to flee from police and was removed from the vehicle by the officers. *Id*. Plaintiff's person was searched by the officers, who found a firearm with five

live rounds. *Id*. Plaintiff told the officers that he held a valid Georgia license to carry the firearm. *Id*. Defendant Officer Ponente attempted to verify the license and was unable to do so. *Id*. at 8. Ultimately, Plaintiff was arrested for carrying a firearm without a license. *Id*. at 9. Defendants claim that due to the lengthy period of investigation, approximately thirty minutes, and the officer's inability to verify the license with Georgia law enforcement, Defendants Officers Ponente and Rozman had a reasonable basis to believe that probable cause existed to arrest Plaintiff for possessing a firearm without a license. *Id*. The fact that the officers were mistaken about the license's validity was reasonable given the facts and circumstances at the time of the arrest. *Id*.[6]

In addition, Defendants claim that the officers are protected from liability due to qualified immunity because Plaintiff has failed to provide evidence supporting his claim of a violation of clearly established law. ECF No. 46 at 12-13. Even if a constitutional violation is established, if officers of reasonable competence could disagree on whether probable cause exists, qualified immunity still bars Plaintiff from suing the arresting officers. Id. at 13. Here, Defendants assert that Officer Ponente made his best efforts to thoroughly investigate the situation but made a mistake and should be protected by qualified immunity from liability for such mistake. Id.

Plaintiff responds that the facts show Officer Ponente falsely arrested him for possession of a firearm without probable cause for the arrest. ECF No. 47 at 4. Mr. Quarles was handcuffed and placed in the back of the police car as soon as the officers discovered the firearm. *Id*. At the time, Plaintiff presented a valid license to carry a firearm and, Plaintiff alleges, Defendants had no probable cause to believe a crime was committed. Id. Further, Officer Ponente was told by an

---

[6] Defendants also claim Plaintiff had pending felony charges in Georgia at the time and was not authorized to carry a firearm pursuant to Georgia law and the conditions of his bond. *Id*. at 9-10. However, there is no indication that the officers knew this information at the time of the arrest.

operator at the Gwinnett County Police Department in Georgia that she did not have access to gun permit records, so it was not sufficient when the teletype contained no information regarding the gun permit. *Id*. at 5. Finally, Plaintiff asserts that there is "no question" that he was legally authorized to possess a firearm at that time through his valid Georgia gun permit. *Id*.

Plaintiff also insists that the alleged traffic violation that initially gave rise to probable cause never happened. *See Noble v. City of Camden*, 112 F. Supp. 3d 208, 230 (D.N.J. 2015). Mr. Quarles was purportedly stopped at an intersection when Officers Ponente and Rozman decided to pull him over. ECF No. 22 ¶ 16. Mr. Quarles claims that he immediately complied with the Defendants' request to pull over and was ordered out of his vehicle and searched for no apparent reason. *Id* ¶¶ 17-18. The officers found the firearm and Georgia license to carry and proceeded to arrest Mr. Quarles and place him in the back of the police vehicle, before attempting to confirm the validity of the license to carry. *Id* ¶¶ 18-19. Mr. Quarles alleges that Defendant Ponente was told over the phone that Georgia's Bureau of Investigation and the Gwinnet County Police Department do not have access to gun permit records, yet the officer concluded that the lack of information meant the license was likely invalid. *Id* ¶¶ 21-22, 25. Mr. Quarles further claims that false information was provided by Defendant Ponente to Philadelphia Detective Rose regarding Georgia's denial of Plaintiff's valid gun permit. *Id* ¶¶ 26-27. Defendants, by contrast, claim that the officers attempted to stop Plaintiff for a traffic violation but he fled in his car. ECF No. 46 at 7. Once Plaintiff attempted to flee, the officers had to initiate a felony car stop and removed Plaintiff from his vehicle to conduct a search of his person and the car. *Id*. Defendants also relay factual material differences during the approximately 30 minutes in which Officer Ponente attempted to verify Mr. Quarles' license to carry. *Id*. at 8-9.

Taking these facts and circumstances in the light most favorable to Plaintiff, it is not difficult to find genuine issues of material fact exist.

"Generally, the question of probable cause in a section 1983 damage suit is one for the jury. This is particularly true where the probable cause determination rests on credibility conflicts." *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 788 (3d Cir. 2000) (citations and internal quotation marks omitted). Under the circumstances and evidence presented for summary judgment, the Court cannot conclude that probable cause exists as a matter of law because the evidence, viewed most favorably to Plaintiff, reasonably may support a contrary factual finding, therefore summary judgment is not appropriate on the February 3, 2020 false arrest claim. *Id.* at 788–89 (internal quotation marks omitted).

   2.   March 28, 2020 (Count 7)

Defendants claim that the Court should grant summary judgment on Count 7 for False Arrest because Officers Turner and Tilghman had probable cause to arrest Plaintiff.[7] Plaintiff concedes that the Court should grant summary judgment as Mr. Quarles is no longer pursuing this claim. ECF No. 47 at 11.

While there may be genuine issues in dispute as to probable cause for the February arrest, none exist in the March arrest. Plaintiff concedes that he could not produce his license to carry (regardless of the reasons for its absence) and thus the arresting officers on March 28 had probable cause to believe a crime had been committed as Plaintiff was carrying a firearm without

---

[7] Plaintiff includes Officers Ponente and Rozman in this false arrest claim but neither were involved in the arrest occurring on March 28, 2020, therefore the Court will not consider them as part of this claim. *Rode v. Dellarciprete*, 845 F.2d 1195 (3rd Cir. 1988). Also, Officers Turner and Tilgham are no longer Defendants in this case.

holding, at that time, a physical license to carry. ECF No. 22 ¶¶ 37-40. Therefore, summary

judgment is granted on the claim for false arrest relating to the March 28, 2020 incident.

## II.    Malicious Prosecution (Counts 4 and 8)

Defendants also claim that the Court should grant summary judgment on Counts 4 and 8

for Malicious Prosecution because of Plaintiff's inability to satisfy the elements of the law and

qualified immunity.[8] "To prove a claim under Section 1983 for malicious prosecution, Plaintiff

must demonstrate that: (1) the defendant initiated a criminal proceeding; (2) the criminal

proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4)

the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a

consequence of a legal proceeding." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir.

2003). "If [p]laintiffs have not proffered evidence sufficient to create a triable issue of fact as to

all five prongs, their malicious prosecution claim must fail as a matter of law." *Domenech v. City

of Philadelphia*, 2009 WL 1109316, at *9 (E.D. Pa. Apr. 23, 2009).

Defendants assert that Plaintiff fails on two elements necessary to establish a claim of

malicious prosecution: initiation of a criminal proceeding and that the officers acted maliciously.

While prosecutors usually initiate criminal proceedings, "an officer may be held to have initiated

criminal proceedings if he knowingly provided false information to the prosecutor or otherwise

interfered with the prosecutor's informed decision[.]" *Henderson v. City of Philadelphia*, 853 F.

Supp. 2d 514, 519 (E.D. Pa. 2012). There is no evidence here that the officers provided false

---

[8] Defendants also allege that this claim cannot be established due to probable cause for the arrest. The Court
previously determined that there remain genuine issues of material fact as to probable and, therefore, probable cause
is insufficient to grant summary judgment on any of the claims in Defendants' Motion.

information to, or concealed information from, prosecutors. *See Johnson v. Logan*, 721 F. App'x

205, 207 (3d Cir. 2018) ("summary judgment was nevertheless warranted on

[plaintiff]'s malicious prosecution claims because there was no evidence that

the Officers initiated criminal proceedings against him.").

Regarding Count 4, Officers Ponente and Rozman provided unadulterated body camera

footage and their arrest memorandum to both the detective and prosecutors. The detective and

prosecutors then investigated the incident and evaluated any charges. Similarly, there is no

evidence in the record that Officer Cujdik misrepresented or concealed any material information

from prosecutors. Plaintiff has also failed to show a dispute regarding the element of malice.

There is no evidence that Officers Ponente and Rozman were motivated by any purpose other

than bringing Mr. Quarles to justice. Regarding Count 8, Plaintiff concedes that summary

judgment is warranted because he is not pursuing this claim. ECF No. 47 at 11. Because Plaintiff

fails to show that there is a genuine issue of material fact as to those elements of malicious

prosecution, summary judgment is warranted on those claims.

### III.   Civil Conspiracy (Count 5)

Defendants assert that no such evidence exists in the record that would support a

conspiracy claim. ECF No. 46 at 14. Plaintiff concedes that the Court should grant summary

judgment because Mr. Quarles is no longer pursuing this claim. ECF No. 47 at 9. Therefore,

summary judgment is warranted on Count 5.[9]

---

[9] Regardless of the stipulation, Plaintiff makes no identifiable assertion of a common plan between the arresting officers, other than the fact that the two were working together as part of their employment. Even a circumstantial "meeting of the minds" is not supported by any specific facts in the record. There is nothing beyond baseless assertions that the officers did anything either before or after the arrest that would constitute a conspiracy to deprive him of his constitutional rights. To survive summary judgment, Plaintiff must identify specific facts showing that there is a genuine issue for trial and mere conclusory allegations are insufficient.

**IV.    Intentional and/or Negligent Infliction of Emotional Distress (Count 9)**

Plaintiff claims in his Amended Complaint that Defendants Ponente and Rozman either intentionally or negligently caused Mr. Quarles to suffer severe emotional distress, which resulted in a diagnosis of PTSD, by illegally searching and arresting him and by providing materially false statements and omissions to prosecutors for crimes that never occurred. ECF No. 22 ¶ 66. Defendants assert that this claim is barred by the Tort Reforms Act and must be dismissed as a matter of law. Plaintiff, in his Response, concedes that summary judgment is warranted on its claim of negligent infliction of emotional distress. ECF No. 47 at 11.[10]

Since it is unclear whether Plaintiff intends to concede its claim of intentional emotional infliction of emotional distress, the Court will address it. Plaintiff does not provide evidence that either incident rises to the level of intentional infliction of emotional distress. The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another. *Manley v. Fitzgerald*, 997 A.2d 1235 (Pa. Commw. Ct. 2010). "While Pennsylvania courts recognize a cause of action for intentional infliction of emotional distress, they allow recovery only in very egregious cases." *Reem Haddad v. Tirun A. Gopal*, 2001 WL 35928055 (Pa. Com. Pl. Feb. 13, 2001); *see also McLaughlin v. Rose Tree Media School Dist.*, 52 F. Supp.2d 484, 494 (E.D. Pa. 1999) (stating the conduct "must be so outrageous in character, and so extreme in degree. as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."). There is nothing in the record that shows extreme or outrageous conduct

---

[10] There appears to be a clerical error in the Plaintiff's Response briefing. In the substantive section on Count 9, Plaintiff concedes that summary judgment should be granted on this claim, though the conclusion section states that the motion should be denied as to Count 9. Since the stipulation is included in the body of the Response, the Court presumes that reflects Plaintiff's intentions. Regardless, while the Court recognizes that immunity for government actors under the Tort Claims Act does not apply to federal civil rights actions, Plaintiff describes this claim as a "violation of Pennsylvania's prohibitions" thereby raising it as a state law claim, to which immunity does apply. *Wade v. City of Pittsburgh*, 765 F.2d 405 (3rd Cir. 1985).

by any of the arresting officers. There is nothing in the record that shows the arresting officers

acted intentionally or recklessly to cause Mr. Quarles severe emotional distress. Therefore,

summary judgment is warranted on the claim of intentional or negligent infliction of emotional

distress.

### V.    Failure to Train/Supervise (Counts 10 and 11); Failure to Discipline (Count 12)

   1.    Monell *Liability Under § 1983*

A municipality or other local government may be liable under 42 U.S.C. § 1983[11] "only

'when execution of a government's policy or custom, whether made by its lawmakers or by those

who edicts or act may fairly be said to represent official policy' deprives a citizen of

constitutional rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Reitz v.*

*Cnty. of Bucks*, 125 F.3d 139, 144 (3d Cir. 1997); *Est. of Singletary v. City of Phila.*, 2021 WL

5235232, at *16 (E.D. Pa. Nov. 10, 2021). Official municipal policy includes the decisions of a

government's lawmakers, the acts of its policymaking officials, and practices so persistent and

widespread as to practically have the force of law. *Pembaur v. City of Cincinnati*, 475 U.S. 469,

480–81 (1986); *McTernan v. City of York*, 564 F.3d 658–59 (3d Cir. 2009).

"[A] § 1983 claim against a municipality may proceed in two ways." *Forrest v. Parry,*

930 F.3d 93, 105 (3d Cir. 2019) (citing *Est. of Roman v. City of Newark*, 914 F.3d 789, 798–99

(3d Cir. 2019)). A plaintiff may show: (1) "that an unconstitutional policy or custom of the

---

[11] Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State
> ... subjects, or causes to be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

municipality led to his or her injuries" or (2) "that [his or her injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Id*. at 19–20. The latter failure to train, supervise, and or discipline context is where Plaintiff makes his claims against Defendant Commissioner Outlaw.

A municipality may be held liable under § 1983 pursuant to the "failure-to-train" theory where the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. Similarly, decisionmakers must have "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citation omitted). Constructive knowledge or a showing that the municipal policymaker "should have known" about the pattern of constitutional misconduct is sufficient to satisfy the first prong of the test. See *Bryan Cnty. v. Brown*, 520 U.S. 397, (1997); *Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F. App'x 909, 913 (3d Cir. 2003) ("[C]onstructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal policymakers should have known of them.") (citation and quotations omitted). If decisionmakers lack actual or constructive notice that their training program is deficient in a particular respect, they cannot be said to have "deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Without proof of a pattern of similar constitutional violations, plaintiff can still succeed on a failure-to-train claim if the need for more or different training is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. This is known as the "single-incident" liability theory. *See Bryan Cnty.*, 520 U.S. at 398 ("This Court has recognized a § 1983 cause of action based on a single decision attributable to a municipality only where the evidence that the municipality had acted, and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation."). To find deliberate indifference from a single-incident violation, the "risk of [] injury must be a 'highly predictable consequence'" of the municipality's failure to provide training as a part of pre-service training. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 225 (3d Cir. 2014) (quoting *Connick*, 563 U.S. at 63).

      2.  <u>Defendant's Motion for Summary Judgment</u>

Defendant Commissioner Outlaw contends that no "constitutional violation by a municipal actor" occurred as a "result of a municipal policy, custom, or practice." ECF No. 46 at 18 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–95 (1978)). The Philadelphia Police Department (PPD) "trains its officers to verify gun permits pursuant to the PPD Directive 5.27 and by running an individual's information through the [Pennsylvania Fusion Center] system," which is the protocol that Defendant Ponente "attempted" to follow. ECF No. 46 at 20.

Further, no evidence in the record establishes that any municipal policymaker "was aware of a risk to persons in Plaintiff's position but failed – with deliberate indifference – to remedy such risk." *Id.* Defendant Outlaw asserts that Plaintiff fails to establish the City's deliberate indifference because no evidence was provided to show that the City was "on notice of the risk

of PPD officers improperly authenticating a Georgia LTC and that it was indifferent to this risk." *Id.* at 21. The record contains no evidence that Defendant Outlaw "(1) knew that officers would encounter Georgia LTC holders and be unable to verify the permit's validity and (2) there was a history of PPD officers mishandling that precise situation." *Id.* at 21-22 ("[Plaintiff] cannot produce any evidence of a pervasive pattern of PPD officers arresting Georgia LTC holders due to their alleged lack of training on how to verify those permits with a probate court in Georgia.").

Finally, Defendant Outlaw contends that no dispute of material fact exists that would warrant Plaintiff's relief under the single-incident liability theory. *Id.* at 22. "[T]he need to train Philadelphia police officers how to identify and authenticate a LTC permit from a state that is located hours away is undoubtedly not obvious." *Id.* "[T]he likelihood that such a situation will recur, and that Philadelphia police officers will routinely be faced with this specific task, is extremely low." *Id.* at 22–23 ("[the] situation alleged by Plaintiff is extremely fact specific.") Accordingly, Defendant Outlaw points to Plaintiff's statement in the Amended Complaint that this incident presents a "unique" process limited to the state of Georgia. *Id.* at 23 (citing ECF No. 16 ¶¶ 28, 50, 68, 70).

> 3.  Plaintiff's Response

Plaintiff characterizes the "troubling facts" as a "classic case of a local government's failure to train" under § 1983 and proceeds to make an identical argument as to why both Counts 10 and 11 should survive summary judgment. ECF No. 47 at 10.

Plaintiff asserts that Defendant Outlaw is "deliberately indifferent as a matter of law" to the consequences that will result from failing to train PPD officers how to verify Georgia LTCs. *Id.* at p. 11. He states that Commissioner Outlaw "knows that every gun permit holder in the State of Georgia is legally entitled to carry firearms throughout every county in Pennsylvania"

and that she has been "on public notice" regarding the difference between Georgia's gun permit verification and Pennsylvania's. *Id.* at 12. Plaintiff claims that, despite these facts, Commissioner Outlaw does not provide any training on how to verify Georgia permits, which makes it "extremely obvious that her officers will likely encounter and wrongfully arrest" Georgia permit-holders. *Id.*

In addition, Plaintiff alleges that his arrests "highlight[] the predictable pattern of wrongful arrests and prosecutions that Commissioner Outlaw knew or should have known would result" from her failure to train PPD officers on how to verify Georgia LTCs. *Id.* at 13. Plaintiff contends that the "pattern" is evident in the fact that none of the officers at the scene knew how to verify Plaintiff's permit and that one even asked Defendant Ponente if he "ever encountered 'this situation before[.]'" *Id.* at 14. Plaintiff also points to his March 28 arrest, wherein officers again did not know how to verify his Georgia LTC, in order to establish a "predictable pattern" of constitutional violations. *Id.*

In the alternative, Plaintiff contends that both of his arrests satisfy the "single-incident" liability theory of failure-to-train claims. *Id.* at 15 (referencing *City of Canton v. Harris*, 489 U.S. 378 (1989). Plaintiff states that there is "no dispute that verifying gun permits is an important duty of a PPD officer," and that "whenever a PPD officer encounters a person armed with a firearm in public, the officer must determine whether that person is lawfully carrying the weapon." *Id.* at 15. Moreover, if no verification can be made, the carrier will "automatically be arrested and charged for carrying a firearm without a license." *Id.* at 16. Accordingly, Plaintiff contends that "there is no dispute that PPD's officers attempting to verify Georgia permits with the same procedure used to verify Pennsylvania permits will automatically result in an arrest of

the Georgia permit holder." *Id.* Plaintiff asserts that his "wrongful arrests and prosecutions" stem

from failure-to-train and were "highly predictable" and "virtually guaranteed." *Id.* at p. 11.

       4.  <u>Analysis</u>

A pattern of similar constitutional violations by untrained employees is ordinarily

necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, U.S.

at 62. Decisionmakers, therefore, must have actual or constructive knowledge of the "pattern of

similar incidents." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998). In the

alternative, a single incident can form the basis of a § 1983 claim if the need for different

training is "so obvious, and the inadequacy so likely to result in the violation of constitutional

rights." *See City of Canton*, 489 U.S. at 390.

       i.  *Failure to Train: Pattern and Knowledge*

No dispute of material fact exists to establish Defendant Outlaw's "deliberate

indifference" as required by § 1983. A pattern of constitutional violations involving PPD's

inability to verify Georgia LTCs does not exist. Indeed, the evidence in the record concerns only

the instances involving Plaintiff, including his first arrest on February 3, 2020, and his second

arrest on March 28, 2020. *See* ECF No. 46. Two instances of PPD's failure to verify a valid

Georgia LTC are not enough to qualify as a pattern under § 1983. *Compare Jones v. Muskegon

Cnty.*, 625 F.3d 935, 946–47 (6th Cir. 2010) ("Although Plaintiff did present evidence that

several inmates' medical requests were ignored by jail personnel, including Jones's, a jury could

not reasonably infer from these five incidents alone that the County had a widespread,

permanent, and well-settled custom of ignoring inmate requests."); *Pineda v. City of Houston*,

291 F.3d 325, 329 (5th Cir. 2002) (holding that the eleven incidents of warrantless searches were

not enough to support a claim for a pattern of illegality), *with Beck v. City of Pittsburgh*, 89 F.3d

966, 968–74 (3d Cir. 1996) (finding a pattern where there were numerous prior excessive force complaints against the police officer; a report by the city recognizing the police department's problems with excessive force and the inadequacy of the procedures to respond to the problems; a lack of formalized reporting of use of force by officers; and the structure of the civilian complaint process that curtailed disciplinary action). Although Defendant Ponente stated that he encountered another Georgia LTC on a singular prior occasion, ECF No. 47-8 at 5, the record fails to show that other officers have been placed in similar situations. *See* ECF No. 16 ¶ 29 ("[T]he Lieutenant was so perplexed that he even asked Defendant Ponente if he had ever encountered 'this situation before[.]'"). Defendant Ponente stated that he makes around 20 to 30 gun arrests per year, 95% of which involve persons who either have no permit or have revoked Pennsylvania permits. ECF No. 47-8 at 12. No evidence in the record suggests that PPD officers are confronted with frequent scenarios requiring them to verify Georgia LTCs. Accordingly, there is no dispute of material facts as to whether a "pattern of constitutional violations" exists.

Defendants have shown that there is no dispute as to Commissioner Outlaw's actual or constructive notice of a pattern to establish her deliberate indifference to an issue with PPD's training policies and customs. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Bryan Cnty.*, 520 U.S. at 407) ("A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."); *Washington-Pope v. City of Phila.*, 2015 WL 7450522, at *17 (E.D. Pa. Nov. 24, 2015). Actual or constructive knowledge can only be established if the pattern already exists. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Even viewed in the light most favorable to Plaintiff, the record does not indicate that Defendant Outlaw "should have known" that a lack of training regarding Georgia LTCs might lead to false arrests because the Reciprocity Agreement provides no clarity as to how Georgia LTCs are verified. *See* ECF No. 47-4 (Exhibit B). In fact, the agreement stipulates that:

> The Commonwealth of Pennsylvania shall recognize all valid GA Licenses issued to legal residents of the State of Georgia who are 21 years of age or older; the rights and privileges of GA License holders recognized under this Reciprocity Agreement shall be the same as, and not greater than, those rights and privileges granted to PA License holders under Pennsylvania law. ECF No. 47-4 at 4.

Without any indication of the proper way to verify Georgia LTCs, the Reciprocity Agreement does not provide Defendant Outlaw with any notice that a pattern of false arrests might occur without distinct training regarding Georgia LTC verification. Hindsight is not enough to establish a failure-to-train claim, for "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (internal citation omitted); *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

### ii. *Failure to Train: Single Incident Liability*

To support a claim for single-incident liability under a failure-to-train claim, the need for different training might be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. This Court has further recognized the obviousness in training deficiencies absent a "pattern of violations" when injuries equate to "highly predictable consequences." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 225 (3d Cir. 2014) (citing *Bryan Cnty.,*520 U.S. at 409).

Plaintiff makes only conclusory statements regarding single-incident liability. *See* ECF No. 47 at 6 (stating conclusively that "there is no dispute that PPD's officers attempting to verify Georgia permits with the same procedure used to verify Pennsylvania permits will automatically result in an arrest of the Georgia permit holder"); *M.B. ex rel. T.B. v. City of Phila.*, 2003 WL 733879, at *8 (E.D. Pa. Mar. 3, 2003) ("Without more than conclusory statements, a reasonable jury could not find that the City's policy or custom caused a constitutional violation.").

Even if Plaintiff did allege more than conclusory statements, no dispute of material fact exists to establish that false arrests are a highly predictable consequence of the City's lack of specific training on Georgia LTC verification. Plaintiff's claim differs from those which this Court has allowed to survive summary judgment. *Compare Lemar v. City of Phila.*, 2015 WL 4450976, at *5 (E.D. Pa. July 20, 2015) (finding a state actor "fail[ed] to provide protective measures and fail safes" to prevent mistakes in a frequently occurring situation) (quoting *Berg v. Allegheny Cnty.*, 219 F.3d 261, 277 (3d Cir. 2000)), *with Thomas*, 749 F.3d at 225 (Corrective officers had "no de-escalation or intervention training" despite working in a "highly volatile prison" environment where there was evidence of a high frequency of fights[.]").

While there is "present evidence" of firearm permit verification being a "frequently occurring situation" for PPD officers, there is no present evidence that Georgia LTC verifications constitute a "frequently occurring situation." *See Berg*, 219 F.3d at 277; *Lemar* 2015 WL 4450976, at *5. Nonetheless, PPD Directive 5.27 serves as the "double check" and "system of safeguards to protect against unlawful" arrests regarding permit verification. *Lemar*, 2015 WL 4450976, at *5. While Direction 5.27 is not specific on how to verify Georgia licenses, it is the "prevailing standard" that officers are required to follow. ECF No. 46-13; *see also* ECF No. 47-8 at 4. Thus, Philadelphia provides some training regarding firearm permit verification. *See*

*Lawson v. City of Coatesville*, 42 F. Supp. 3d 664, 680 n.12 (E.D. Pa. 2014) (internal citation omitted) ("There is no dispute that Coatesville Police Officers are trained in the requirements of probable cause and continue to receive legal updates on these requirements through Act 180. Thus, any need for additional nuanced training is not patently obvious, absent a pattern of similar violations."). Additionally, as mentioned *supra,* the deficiency alleged here is too nuanced to support an inference of deliberate indifference to a harm that is highly predictable. Therefore, Defendants' motion for summary judgment regarding Counts 10 and 11 is granted.

## VI.    CONCLUSION

In accordance with the above reasoning, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. For Counts 4, 5, 7, 8, 9, 10, 11, and 12, summary judgment is **GRANTED**. For Count 1, summary judgment is **DENIED**.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**